*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court Nos. S-17721/17811 |
| MARK V. | ) ) ) ) ) ) | Superior Court No. 3AN-16-00221 PR  O P I N I O N  No. 7576 – December 30, 2021 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una S. Gandbhir, Judge.

Appearances: Courtney Lewis and Sharon Barr, Assistant Public Defenders, and Samantha Cherot, Public Defender, Anchorage, for Mark V. Katherine Demarest and Laura Wolff, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Maassen, and Carney, Justices. [Bolger, Chief Justice, and Borghesan, Justice, not participating.]

CARNEY, Justice.

## I.      INTRODUCTION

A man with severe mental illness stabbed his parents six years ago during a psychotic episode and was subsequently committed to a psychiatric hospital. He appeals his latest commitment order. Before the commitment hearing, he stopped taking prescribed medications, leading hospital staff to petition for permission to administer medication involuntarily. The court granted the medication petition as well as a revised

petition requesting a higher dose. He appeals both the commitment order and the order authorizing involuntary administration of medication. We affirm both orders.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Mark V.[1] has a history of severe mental illness.[2] He has been diagnosed with schizoaffective disorder, bipolar type, and the superior court has repeatedly granted petitions to commit him to the Alaska Psychiatric Institute (API). In 2015, he stabbed his parents during a psychotic episode. He was committed to API after having been determined incompetent to stand trial. He has remained there since.

### B.    Commitment Proceedings

In late September 2019 Gerald Martone, a psychiatric advanced nurse practitioner at API, petitioned for a 180-day commitment order pursuant to AS 47.30.770.[3] The court held a jury trial over several days. The State called Martone, who was responsible for Mark's treatment, to testify. Martone described Mark's diagnosis of "[s]chizoaffective disorder, bipolar type," as "very similar to schizophrenia" and characterized by "hallucinations[,] . . . delusions[,] . . . cognitive distortions[,] . . .

---

[1]    We use a pseudonym to protect Mark's privacy.

[2]    Mark has appealed several previous commitment orders. *See In re Hospitalization of Mark V.* (*Mark I*), 324 P.3d 840, 842 (Alaska 2014), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019); *In re Hospitalization of Mark V.* (*Mark II*), 375 P.3d 51 (Alaska 2016), *abrogated on other grounds by In re Naomi B.*, 435 P.3d 918.

[3]    Alaska's involuntary commitment law is contained in several statutes authorizing progressively longer periods of involuntary treatment if necessary. AS 47.30.730(a) outlines the procedure for a 30-day commitment; AS 47.30.740(a) provides for an additional 90-day commitment, and AS 47.30.770 establishes the requirements for a 180-day commitment period following a 90-day one. In rare cases, subsequent 180-day periods of hospitalization may be authorized. AS 47.30.770(c).

[and] mood swings." He testified that Mark's symptoms were mostly controlled by antipsychotic medication but that "[h]e still suffer[ed] from some delusions and occasional hallucinations" and deteriorated rapidly when unmedicated.

Martone described API's facilities and explained that Mark was allowed periodic supervised passes that permitted him to leave API and do laundry and go grocery shopping. These passes were API's "attempt to prepare for eventual discharge and reintegrat[ion] into the community." But Martone testified that Mark was not ready to be discharged and that he was concerned Mark would stop taking medications if he were released because he had previously "stopped when he's left." He explained that Mark "attributes some undesirable side effects to the medications," in particular "[e]rectile dysfunction and ejaculatory delay," which Martone characterized as "[v]ery important" to Mark. He testified that Mark would like to be in a sexual relationship and viewed his medications as interfering with his ability to do so.

Martone concluded his testimony by explaining that although the goal for every patient at API is "to get out of the hospital and return to the community[,] . . . [t]here is not an option right now available for [Mark] that could provide the level of supervision and medical care that he needs." He stated that Mark was not a risk of harm to others "[i]f he stays on his medications and stays in a structured environment" but that he would be a danger "[i]f he was unsupervised and unmedicated."

On cross-examination, Martone testified that he could not "predict a date" when Mark would be ready for discharge, as that would depend on "when a suitable structured, supervised living situation is available." Martone testified that, if Mark were unmedicated, Mark's "parents would feel very much in danger" and other people would be in danger "when he is frustrated." But Martone conceded that Mark had not physically "lashed out at anyone" during his time at API, even when he was frustrated.

He also testified that there had been instances when other patients at API had harassed or assaulted Mark and that Mark had responded appropriately.

Mark then testified on his own behalf. He gave an ambivalent answer to whether he would visit his parents if he were released. Throughout his testimony, he stressed the importance of his ability to have sex and masturbate, and offered oblique justifications for stabbing his parents.

The State and Mark each made closing arguments. The jury found by clear and convincing evidence that Mark was mentally ill and likely to cause harm to himself or others.

In December the court held a hearing to determine whether there was a less restrictive alternative than ordering Mark to remain at API for an additional 180 days.[4] The State again called Martone to testify. Martone described a typical day for Mark at API. He explained that Mark was on the "least restrictive" end of the spectrum of restrictions at API and did not need one-on-one staff supervision. Martone acknowledged that there was an unlocked mental health unit at a different hospital that would be less restrictive, but he did not think it would be appropriate for Mark because it required "very active involvement [in] therapeutic groups," which he "does not like to participate in." Martone also testified that he did not believe an outpatient program could meet Mark's needs because it could not adequately supervise his medication intake or provide a structured and therapeutic environment.

---

[4] *See* AS 47.30.655(2) (requiring that mentally ill "persons be treated in the least restrictive alternative environment consistent with their treatment needs"); AS 47.30.735(d) (authorizing court to find less restrictive alternative than commitment to treatment facility for 30 days); AS 47.30.770 (applying same to 180-day commitment hearings).

Martone explained on cross-examination that a treatment team was in charge of making a discharge plan for Mark. Such a plan would "involve[] a residential option, an outpatient provider, medication prescriber, [and] therapy case management." He described one assisted living home being investigated by the social worker on the treatment team, but conceded that he did not know whether the home had the funding for one-on-one care for Mark. Martone also testified that the social worker had been in contact with an outpatient mental health program, but that the program was not "able to say that they would be able to do daily medication management." And he testified that in his opinion, an assisted living facility would not provide enough structure because "the quality is uneven" and "it's not a therapeutic environment . . . [because] staff are not trained to have therapeutic interactions with patients." Martone admitted that he had been comfortable sending other patients to assisted living homes. And he conceded that he "d[idn't] know the specifics" of what was "standing in the way of everything being in place for th[e] discharge plan" because he had been last updated "a couple months ago." Finally, he testified that Mark's parents had recently moved; that Mark did not know their new address; and that Mark had never expressed an intention to make contact with them.

The court then "ha[d] a couple questions" for Martone. Martone clarified that the "therapeutic community" Mark required was "not the actual groups. It's . . . living with other people and encountering both the positive and negatives of that experience . . . ." Martone also testified that Mark was able to maintain sustained friendships at API and to make medical and day-to-day choices. On subsequent cross-examination, Martone conceded that API could be "loud" and that the threats and assaults Mark had experienced were not beneficial to him. Martone also confirmed that there were other patients "who are at [Mark's] level of . . . independence within the unit" for him to interact with.

Mark testified after Martone. He testified that he and the social worker had "meetings here and there" about his discharge plan. He described an assisted living facility run by someone named "Malua" and emphasized that "you have to take your meds. . . . [I]f you don't then they'll take you right back to the hospital." Mark confirmed that he would be willing to go to the assisted living facility, although his attorney later clarified that she was not seeking an order committing Mark to that facility because it was "not possible with the licensure." Mark testified that if he were able to go to the assisted living facility he would continue to take his medications.

Mark also expressed his unhappiness with being confined at API and said that he did not "feel that [he was] guilty of a crime." He characterized stabbing his parents as "[a] very misfortunate accident," said that it was not "a liability on [his] part," and noted that it had "been a long time since then."

The court issued its order in January 2020. It found that there was "no feasible less restrictive alternative to commitment at API at this time." The court also specified that "the State has an ongoing obligation to continue evaluating appropriate discharge planning for [Mark], including the possibility of services under the upcoming HB 1115 waiver that would allow him to transition to a community setting."[5] The court stated that although Mark's "demeanor and presentation was the best [it] ha[d] seen to date," the court did "not believe [Mark's] proposed plan meets the standard of a less restrictive treatment alternative." It noted that "[w]hile being in an apartment in the

---

[5] *See* 42 U.S.C. § 1315 (2018) (describing requirements for Medicaid waivers); *About Section 1115 Demonstrations*, MEDICAID.GOV, https://www.medicaid.gov/medicaid/section-1115-demonstrations/about-section-1115-demonstrations/index.html (last visited Sep. 28, 2021) ("Section 1115 of the Social Security Act gives the Secretary of Health and Human Services authority to approve experimental, pilot, or demonstration projects that are found by the Secretary to be likely to assist in promoting the objectives of the Medicaid program.").

community might provide the appearance of a less restrictive setting, [Mark] still requires the equivalent of a 24-hour third-party custodian to be able to live safely and maintain his medication regime outside of API." It found that although "[s]ome . . . steps have been taken, such as determining the Alaska Community Mental Health Services is willing to handle his medication[,] . . . [o]thers, such as a group home, apartment, or assisted living facility with round-the-clock supervision, have not been put into place."

### C. Medication Proceedings

In May 2020 Martone petitioned for authorization to involuntarily administer two medications, aripiprazole and ziprasidone, because Mark had stopped taking medication and Martone believed him to be "incapable of giving or withholding informed consent." The court scheduled a hearing and appointed a court visitor.[6]

A hearing on the medication petition was held on May 18. Due to pandemic safety measures, all parties appeared by telephone.[7] Mark interrupted periodically throughout the hearing, expressing his frustration at the testimony, and hanging up several times.

The court visitor, testifying first, stated that she had spoken to Mark on May 13 as well as earlier on the day of the hearing. She opined that Mark "has some legitimate concern and . . . express[ed a] reasonable objection, especially as it relates to his performance sexually." But she also stated that Mark did not "appear able to rationally engage in treatment [because he] lacks insight and does not recognize a need for treatment." She described his "pressured speech and disorganized thinking" and

---

**6**    *See* AS 47.30.839(d) (requiring court to direct Office of Public Advocacy to provide court visitor to investigate patient's capacity to give informed consent to administration of psychotropic medication); AS 13.26.005(12) (defining "visitor").

**7**    *See* Alaska Supreme Court Order No. 1957 (Mar. 13, 2020) (relaxing court rules for telephone or videoconference participation in response to COVID-19).

stated that "[h]e was not able to engage in a conversation about the benefit of medication." She concluded that Mark lacked the capacity to give consent to medication.

Martone then testified that he did not believe Mark could make an informed decision about medication because "[h]e is acutely psychotic at this time. He's very irrational and he's unable to comprehend his situation." Martone testified that Mark generally understood that he has a mental illness, but he was "preoccupied about what he feels are side effects of the medications" and believed he could not be compelled to take medications unless he had committed a crime. Martone testified that Mark "becomes very hostile and aggressive if the conversation persists" and that he did not believe Mark was able to be rational. He also noted that the medications Mark was prescribed were "the least likely" to cause Mark's reported symptoms. Martone believed the symptoms were due to Mark's lifestyle and age.

Martone also testified that untreated psychosis could lead to irreversible brain damage and that medication was "the most humane way to proceed right now." He described Mark's current status as "aggressive, threatening, very disorganized and irrational. He . . . doesn't sleep at all. He can be heard yelling in his room all through the night. He's been threatening me and threatening staff."

On cross-examination, Martone testified that Mark had never before required a petition for involuntary medication. He agreed that "up until the middle of March" Mark had been getting community passes and that those passes were important to Mark. Martone conceded that the pandemic had been hard on Mark, but said that he could not "attribute his stopping taking medications to the pandemic." He also acknowledged that Mark had stated he would take a lower dose of one of his antipsychotic medications, but that it would be "too low of a dose."

Following closing arguments, the court made oral findings on the record. It found that Mark "lack[ed] the ability to give or withhold informed consent," "that the

administration of medications in the petition [was] in his best interest[,] and that [there was] no less restrictive alternative at this time." The court relied on Martone's testimony, which it found credible, that "without medication [Mark] is likely to get worse" and "that the benefits of the medications outweigh the risks." It also found that the dosage requests were "appropriate" and that lowering the dose to the level Mark preferred would "be an outcome that is neither to his benefit nor to the benefit of API" because it would leave him "sort of half treated." It also found that the requested dose of one medication was higher than usual but was justified by Mark's "extraordinary circumstances." The court reiterated its findings in a written order the next day.

Two and a half weeks later Martone submitted a revised medication petition requesting permission to increase the dosage of the injectable form of ziprasidone. The court scheduled a hearing to address the new request. The court visitor testified that based on another interview with Mark, the answer was "both yes and no" regarding whether he was able to articulate reasonable objections to medications. The court visitor reported that Mark believed that forced medication was "a violation of his civil rights" and he did "not believe that he needs treatment." She did not believe that "he could rationally engage in treatment at this point in time," and she reported that Mark did not "demonstrate a rational thought process" and "exhibited pressured speech and somewhat disorganized thinking." She concluded that he did not have capacity to give consent.

Martone testified and explained that the revised petition was meant to correct a typographical error in the original petition regarding dosage. Martone also did not believe Mark had capacity to make informed decisions about medication because "[h]e struggles to . . . understand the purpose of the medication, why he needs it, and the risks and benefits of treatment versus no treatment." He testified that Mark "has a lot of misconceptions and delusions about side effects of medications" and that "his thoughts are very disorganized and he has illogical thinking patterns."

On cross-examination, Martone testified that Mark had been taking the medication that the court ordered "at a substantially reduced dose." He testified that Mark was "irritable," "can be aggressive," and that "[h]e makes sexual gestures towards staff at times."[8] He conceded that Mark had not touched anyone "violently or inappropriately" since the last hearing, although he had "pounded on the windows of the nurse's station" when he felt a request was taking too long. He also testified that Mark had not had a "code gray"[9] since he arrived at API. Martone acknowledged there were some possible sexual side effects to antipsychotic medications and that as a "provider [he] rel[ies] on patients to report what their side effects are."

Mark testified next. He explained that he did not believe the injectable version of ziprasidone caused sexual side effects, but that he believed the generic oral version did. He objected to the court visitor saying he had pressured speech, stating that "a lot of people are under pressure, you know, I mean, you could pull a gun on somebody and say, hey, you know, dance or whatever." He testified that he had not violated any laws and questioned the necessity of a higher dose. He stated that he did not object to the ziprasidone injection but stated that it was "a nuisance" and that he didn't "believe it [was] going to help anything."

The court found that Mark was "improving and that he ha[d] some clarity and capacity in some areas, and not as much in others." But it found that Mark did not have capacity to make an informed decision about medication. The court noted that it had heard testimony in the previous hearing suggesting that Mark would not take medication without a court order, which it believed to be "a reflection of limited

---

[8]     Mark interrupted at this point to say, "Sorry, but you'd have to prove that, sir, or the umpire gets fired." He then apologized.

[9]     Martone explained that a code gray is "[a] behavioral emergency. It's a request for other staff to come to the unit to help."

understanding of what the impact of these medications are." The court also voiced its concern that "permanent damage will result from under-treatment." The court granted the State's revised petition.

Mark appeals the commitment order and both orders authorizing administration of psychotropic medication.

## III. STANDARD OF REVIEW

We review factual findings in involuntary commitment or medication proceedings for clear error and will reverse "only if we have a 'definite and firm conviction that a mistake has been made.' "[10] We review de novo whether the superior court's "findings meet the involuntary commitment and medication statutory requirements."[11]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Finding There Was No Less Restrictive Alternative To Confinement.

Mark's appeal of the commitment order challenges only the court's finding that API was the least restrictive alternative to confinement. He argues that the court unfairly shifted the burden of proof from the State to him and that the court should have applied federal antidiscrimination law to the issue of whether there was a less restrictive alternative.

---

[10] *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

[11] *In re Jacob S.*, 384 P.3d at 764.

### 1. The court did not shift the burden of proof to Mark.

In an involuntary commitment proceeding, the State bears the burden to prove there was no less restrictive alternative to confinement.[12] Mark argues that the court improperly shifted that burden to him. He cites the court's statement that "[f]or the [c]ourt to release him, [Mark] needs to show that . . . safeguards are preemptively in place and will be implemented on an ongoing basis." The State argues that this language "could admittedly have been more precise" but that it reflected the court's response to Mark's argument that there was a less restrictive alternative as opposed to shifting the burden of proof.

At the outset of its order, the superior court found that "[h]aving considered the testimony of [Mark], the State's witnesses, the evidence submitted by the parties, and the arguments of counsel," there was no feasible less restrictive alternative to commitment. The superior court also noted that the "burden of proof lies with the State to show clear and convincing evidence that no less restrictive treatment alternative is available."

We have held that "for a program to be considered a less restrictive alternative, 'the alternative must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action.' "[13] The court found that Mark "still requires the equivalent of a 24-hour third-party custodian to be able to live safely and maintain his medication regime outside of API." And it found that "[s]ome of those steps have been taken," but that others had not.

---

[12]    *In re Hospitalization of Mark V. (Mark II)*, 375 P.3d 51, 56 (Alaska 2016), *abrogated on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[13]    *In re Naomi B.*, 435 P.3d at 933 (citing *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185 (Alaska 2009)).

As a result, it found that "no less restrictive treatment alternative is available or feasible for [Mark] at this time." The evidence presented supported the court's finding that there was no less feasible alternative actually available. Although the superior court could have made a clearer finding that the State met its burden based on the testimony presented at the hearing, it did not shift the burden of proof.

### 2. It was not plain error for the court to fail to consider federal antidiscrimination law.

Mark argues that "[t]he [S]tate's duty to consider less restrictive alternatives is an affirmative obligation arising from federal antidiscrimination law." But Mark did not raise this argument before the superior court, and therefore we do not need to consider it except in limited circumstances. "[W]e will not consider arguments that were not raised below, unless the issues establish plain error, or the issues (1) do not depend upon new facts, (2) are closely related to other arguments at trial, and (3) could have been gleaned from the pleadings."[14]

Mark argues that because his "general argument" was that "he should be integrated into a community setting instead of institutionalized," his more specific antidiscrimination argument was preserved and he should therefore be allowed to " 'expand' or 'refine' this argument on appeal." It is true that Mark argued below that he should be released and allowed to live in an assisted living facility. But on appeal, he more specifically contends that the State was required to include evidence that it "affirmatively integrate[s] individuals with disabilities and provide[s] them with

---

[14]    *Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc.*, 32 P.3d 346, 351 (Alaska 2001) (citing *State Farm Auto. Ins. v. Raymer*, 977 P.2d 706, 711 (Alaska 1999)).

reasonable accommodations." Because this argument could not have been "gleaned from the pleadings,"[15] it is waived.

In the alternative Mark contends that the superior court's failure to consider federal antidiscrimination law constituted plain error. "A plain error involves an 'obvious mistake' that is 'obviously prejudicial.' "[16] Mark concedes that "Alaska's case law is silent as to the A[mericans with] D[isabilities] A[ct]'s application in the involuntary commitment context." It was therefore not an obvious mistake for the superior court not to consider it. It is also not clear that failure to apply federal antidiscrimination law would be prejudicial, much less obviously so. Mark argues that his fundamental liberty interest was at stake and that "the [S]tate's sole witness had not spoken to the individual in charge of [Mark's] discharge plan about the discharge status in 'months.' " Under Alaska law, the State has the burden to demonstrate that there is no feasible less restrictive alternative.[17] Mark's argument appears to be that the State did not meet its burden; that argument clearly falls within the scope of the least restrictive alternative analysis. The court's failure to consider federal antidiscrimination law would therefore not have been prejudicial.[18]

---

[15]     *Id.*

[16]     *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014) (quoting *State, Dep't of Revenue, Child Support Enf't Div. ex rel. P.M. v. Mitchell*, 930 P.2d 1284, 1288 (Alaska 1997)).

[17]     *Mark II*, 375 P.3d at 56.

[18]     We also note that federal antidiscrimination law does not necessarily provide any additional protections beyond those already provided by the Alaska commitment statutes. The first requirement in *Olmstead v. L.C. ex rel. Zimring* is that "the State's treatment professionals have determined that community placement is appropriate." 527 U.S. 581, 587 (1999). In this case, Martone testified that an outpatient

(continued...)

Even if Mark had argued under Alaska law that the court was required to explicitly consider ADA requirements in its least restrictive alternative analysis, the outcome would not have been different. Mark advised the court that he was not requesting an outpatient commitment because of licensure issues with assisted living facilities. And the court heard testimony from Martone that the only other available inpatient facility would not be appropriate for Mark because of its focus on therapeutic groups. Although the superior court expressed hope that a Medicaid waiver would be available soon and allow for Mark's release from API, it was not currently available. We addressed a similar issue in *In re Hospitalization of Naomi B.*, where the appellant argued that the State had an obligation to re-open a closed facility. We found that the superior court, in determining which option was the least restrictive alternative, "needed to answer that question with one of the options actually available to it at the time of the hearing."[19] In this case, the Medicaid waiver that may at some point allow Mark to live outside API does not yet exist, and therefore the superior court did not err by not considering it in its analysis.

---

[18]    (...continued)
setting was not appropriate for Mark.

[19]    435 P.3d 918, 933 (Alaska 2019).

**B.** **The Superior Court Did Not Err By Finding That Mark Lacked Capacity To Give Or Withhold Consent To Psychotropic Medication.**

Mark also appeals the superior court's finding that he was unable to give or withhold consent to medication.[20] He argues that the State did not meet its burden to prove he was incompetent at either the May 18 or June 16 hearings. Before the court may authorize involuntary administration of psychotropic medication, "the State must prove — by clear and convincing evidence — 'that the committed patient is currently unable to give or withhold informed consent regarding an appropriate course of treatment' and that the patient never refused such treatment while previously competent."[21]

A person is competent to consent to administration of medication if the person:

(A) has the capacity to assimilate relevant facts and to appreciate and understand the patient's situation with regard to those facts . . . ;

(B) appreciates that the patient has a mental disorder or impairment, if the evidence so indicates; denial of a significantly disabling disorder or impairment, when faced with substantial evidence of its existence, constitutes evidence that the patient lacks the capability to make mental health treatment decisions;

(C) has the capacity to participate in treatment decisions by means of a rational thought process; and

---

[20] In *Myers v. Alaska Psychiatric Inst.*, this court held that in addition to the statutory requirements laid out in AS 47.30.839, a court must make an independent determination that administration of medication is both in the patient's best interests and the least intrusive alternative available. 138 P.3d 238, 254 (Alaska 2006). But Mark does not appeal the court's best interests determination.

[21] *In re Hospitalization of Jacob S.*, 384 P.3d 758, 769-70 (Alaska 2016) (quoting *Myers*, 138 P.3d at 243).

-16- 7576

(D) is able to articulate reasonable objections to using the offered medication[.][22]

We have held that the superior court is not required to weigh all these factors and that "[a] single factor . . . can be dispositive when determining a patient's competency."[23]

### 1. The court did not clearly err by finding that Mark was not competent during the May 18 hearing.

Mark argues that "[a]t the May 18 hearing, [he] demonstrated both that he had the capacity to assimilate relevant facts and understand his situation with regard to those facts and that he knew he had a mental illness." He points to the court visitor's and Martone's testimony that he recognized that he was mentally ill. He also argues that his objections to the medications were reasonable because "psychotropic medication has serious, potentially life altering and threatening, side effects." And he argues that his "current ability to give or withhold consent to medication is bolstered by the fact that he previously demonstrated that he was knowledgeable enough and engaged enough in his own health care to ask to have his medications switched" and by the fact that he was willing to take a low dose of aripiprazole.

But both the court visitor and Martone also testified that Mark did not have capacity. The court visitor testified that Mark lacked "a rational thought process" and "was not able to engage in a conversation about the benefit of medication." She also testified that Mark was concerned about the side effects of a medication that was not one of the those listed in the petition. And the court heard testimony from Martone that Mark could not make an informed choice because he was "acutely psychotic" and "unable to comprehend his situation." Martone believed that Mark "is unable to hear" when

---

[22] AS 47.30.837.

[23] *In re Jacob S.*, 384 P.3d at 770.

Martone described his sexual symptoms as likely age-related and stated that Mark became "very hostile and aggressive if the conversation persists." At this point, Mark interrupted and told him to "shut the fuck up the first time I tell you." The court could reasonably conclude based on this testimony that Mark did not have "the capacity to participate in treatment decisions by means of a rational thought process."[24]

The court also heard testimony that Mark was not able to present reasonable objections to his medications. Martone testified that the side effects Mark was concerned with were the least likely to result from the medications he was on. And he testified that Mark was "unable to hear" him when he attempted to explain that other factors might be causing his symptoms. And as the State points out, although "Mark argues on appeal that some of the potential side effects of psychotropic medication . . . are severe[,] . . . there was no evidence that Mark was concerned about such possible side effects." Martone also provided extensive testimony about other possible side effects and treatments, most of which Mark had not reported. And he testified that based upon Mark's medical history he would "anticipate [Mark] would continue . . . to tolerate [the medications] well." The court therefore had reason to find that Mark was not able to articulate reasonable objections to the medications.

Because the evidence presented demonstrated that Mark did not have the capacity to participate in treatment decisions or to raise reasonable objections to the medications, the court did not clearly err in finding that Mark was not competent under AS 47.30.837.

---

[24]     AS 47.30.837(d)(1)(C).

**2. Although the court should have made more specific findings, it was not clear error to find that Mark was not competent at the June 16 hearing.**

Mark argues that he was competent at the time of the June 16 hearing. He argues that the court visitor's testimony that he had "pressured speech . . . does not outweigh the fact that he understood he was mentally ill and had rational reasons for not wanting to take the proposed medications." Mark also argues that the fact that he had never had a code gray supported his ability to be rational and that his apology after interrupting the court and his agreement to take ziprasidone by injection demonstrated his competence.

The superior court found that Mark had "some . . . capacity in some areas, and not as much in others." But it found that Mark's refusal to take medication without a court order was "a reflection of limited understanding of what the impact of these medications are." And it expressed concern about potential "permanent damage [to Mark] . . . from under-treatment."

The court did not "believe at this time that [Mark] has the capacity to make this decision," but it did not discuss the statutory factors for a finding of incompetence. The statutory framework requires the court to determine that the patient was "not competent to provide informed consent."[25] Competency is defined in AS 47.30.837, and requires that patients have capacity to "assimilate relevant facts" and understand their situation, understand that they have a mental disorder, have "capacity to participate in treatment decisions by means of a rational thought process," and be "able to articulate reasonable objections" to the medications.[26] In *In re Hospitalization of Arthur A.*, which we decided after Mark filed this appeal, we noted that a "facility may overcome the

---

[25]     AS 47.30.839.

[26]     AS 47.30.837(d)(1).

respondent's decision to not receive psychotropic medication only with a court order that includes specific findings."[27] In this case, the only finding the court made specific to the competency factors was that Mark's refusal to take medications was "a reflection of limited understanding of what the impact of these medications are."

We remind superior courts that medication orders require specific findings. But we affirm the June 16 medication order because reviewing the record does not lead to a "definite and firm conviction that a mistake has been made."[28] The court heard testimony from the court visitor that Mark "does not believe that he needs treatment" and that she did not believe "he could rationally engage in treatment." It also heard testimony from Martone that Mark "struggles to . . . understand the purpose of the medication, why he needs it, and the risks and benefits of treatment versus no treatment." And it heard testimony from Mark, who stated that the injectible medication was "a nuisance" and that he did not "believe it [was] going to help anything." Mark also appeared to believe that the court could only order involuntary administration of medication if he had committed a crime.

The testimony before the court supported a finding that Mark was not competent to participate in treatment decisions because he appeared unable to assimilate the information provided by treatment providers, lacked "clarity and capacity in some areas" relevant to his condition, and lacked a rational thought process. The court did not clearly err by granting the medication petition.

## V.    CONCLUSION

The superior court's January 13, 2020 commitment order is AFFIRMED. The superior court's May 18 and June 16, 2020 medication orders are AFFIRMED.

---

[27]    457 P.3d 540, 548 (Alaska 2020).

[28]    *In re Hospitalization of Jacob S.*, 384 P.3d 758, 764 (Alaska 2016).