*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of<br><br>ABIGAIL B. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Supreme Court Nos. S-17389/17616 (Consolidated)<br><br>Superior Court No. 3AN-19-00135 PR |

In the Matter of the Necessity for the Hospitalization of

ABIGAIL B.
_____

) Supreme Court Nos. S-17389/17616
) (Consolidated)
)
) Superior Court No. 3AN-19-00135 PR
)
) O P I N I O N
)
In the Matter of the Necessity for the Hospitalization of

JETHRO S.
_____

) No. 7650 – April 28, 2023
)
)
) Superior Court No. 3KN-19-00129 PR
)

Appeal in File No. S-17389 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge. Appeal in File No. S-17616 from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Lance Joanis, Judge.

Appearances: George W.P. Madeira, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Abigail B. and Jethro S. Laura Wolff, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Winfree, Chief Justice, Maassen, Carney, and Henderson, Justices. [Borghesan, Justice, not participating.]

HENDERSON, Justice.

## I. INTRODUCTION

Two individuals were detained at local hospitals after they suffered psychiatric emergencies. The superior court orders authorizing the detentions required each individual to be immediately transported to an available bed at an evaluation facility. But there were no beds available, so neither individual was immediately transported. After holding review hearings at the individuals' requests, the superior court in each case authorized continued detention. The individuals remained detained in hospitals until they were transported to evaluation facilities. They appeal the detention orders, arguing that their prolonged pre-evaluation detentions violated their substantive due process rights. Applying our recent decision in *In re Hospitalization of Mabel B.*,[1] we agree that the individuals' substantive due process rights were violated because the nature and duration of their detentions were not reasonably related to the purpose of facilitating immediate transportation for evaluation.

## II. FACTS AND PROCEEDINGS

### A. Statutory Framework

Alaska law provides procedures for certain individuals with mental illness or grave disability to undergo involuntary commitment.[2] Upon petition and a superior court's determination that there is probable cause to believe an individual is mentally ill and, as a result of that mental illness, is gravely disabled or likely to cause serious harm to self or others, the court may order that the individual be transported to an evaluation facility for further examination and evaluation of whether the person meets commitment

---

[1] 485 P.3d 1018 (Alaska 2021).

[2] 485 P.3d at 1019-20; *see generally* AS 47.30.700-.815 (detailing involuntary commitment procedures). We note that the legislature amended these statutes during the pendency of this case. *See* SLA 2022, ch. 41, eff. Oct. 13, 2022. These amendments do not affect our analysis.

criteria.[3]  In emergent circumstances, when a peace officer or particular type of licensed health professional has probable cause to believe a person is gravely disabled or mentally ill and likely to cause serious harm of an especially immediate nature to self or others, that person may be placed in protective custody pending further evaluation.[4]  "When a facility receives a proper order for evaluation, it shall accept the order and the respondent for an evaluation period not to exceed 72 hours," excluding weekends and holidays.[5] Although the "statutes do not explicitly create any time limits between the ex parte order

---

[3]      *See In re Mabel B.*, 485 P.3d at 1019-20.  As outlined in *In re Mabel B.*, an involuntary commitment may begin with any adult's petition to superior court with reasonable belief that a person "present[s] a likelihood of serious harm to self or others or is gravely disabled as a result of mental illness."  *Id.* at 1019 (quoting AS 47.30.700). If the court then finds probable cause to support that reasonable belief, it may issue an ex parte order and direct a peace officer to transport the person "to the nearest appropriate facility for emergency examination or treatment."  *Id.* (quoting AS 47.30.700(a)).  Alternatively, an involuntary commitment may begin with an emergency detention for evaluation.  *Id.* at 1019-20; AS 47.30.705.  A peace officer or certain licensed health professionals with "probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others" may take that person into protective custody, transport the person to an appropriate evaluation facility, and apply for a mental health examination. AS 47.30.705(a).  In such a case, any likely harm to self or others must be "of such an immediate nature" that safety concerns prevent initiating involuntary commitment via a superior court petition under AS 47.30.700.  *See id.*

[4]      *See In re Mabel B.* 485 P.3d at 1019-20; AS 47.30.705.

[5]      AS 47.30.715 (requiring evaluation facility to "accept the order and the respondent for an evaluation period not to exceed 72 hours"); AS 47.30.805(a)(1) (excluding weekends and holidays from 72-hour computation); *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 837-38 (Alaska 2014) (holding that 72-hour period begins when individual arrives at evaluation facility).

and transport to the facility,"[6] they nonetheless "evidence a legislative intent that the respondent who is subject to an emergency ex parte order must be transported immediately to the nearest evaluation facility."[7] Due to facility capacity issues, however, individuals like the respondents in this case have at times been detained for lengthy periods while awaiting evaluation.[8]

### B. Abigail's Pre-Evaluation Detention

On January 19, 2019, Abigail[9] was taken to the emergency room at Providence Kodiak Island Medical Center after her husband called the State Troopers to report she had attempted suicide. She was escorted by a Kodiak police officer, who sent the court notice of Abigail's emergency pre-evaluation detention indicating his belief that Abigail was mentally ill and that there was probable cause she was likely to cause serious self-harm based on her statements that "she wanted to kill herself" after she "admitted taking approximately 20 pills" over the prescribed amount.

When Abigail arrived at the hospital she tried to harm herself, including by pulling out her own hair, and was aggressive toward hospital staff. Abigail presented "right below" the "highest risk" level when she was admitted. The Kodiak hospital staff restrained her physically and chemically, including temporary use of four-point physical restraints and a shot of the powerful anti-psychotic drug Haldol, which can continue having effects for up to a week and a half. The hospital would not let her leave without

---

[6] *In re Mabel B.*, 485 P.3d at 1020.

[7] *In re Gabriel C.*, 324 P.3d at 838.

[8] *See In re Mabel B.*, 485 P.3d at 1020-23 (documenting detentions of respondents awaiting mental health evaluations for more than two weeks).

[9] We use pseudonyms to protect the parties' privacy.

a court order; had she attempted to leave, hospital security would have detained her or called the police to detain her in the hospital or in jail.

A social worker at the hospital petitioned the superior court for an ex parte order authorizing Abigail's hospitalization for evaluation. The petition alleged that Abigail was mentally ill because she had tried to commit suicide by ingesting a bottle of prescription acetaminophen-codeine while drinking three large beers. It also explained that Abigail told paramedics she "wanted to kill herself" and told an emergency room doctor that she "want[ed] [t]o die." A master recommended granting the order for hospitalization at the first available facility, and the superior court approved the master's recommendation.

Despite the superior court's order that Abigail be delivered "immediate[ly]" to the "first available bed" at an evaluation facility, she remained detained at the Kodiak hospital because there were no available beds at any evaluation facilities. Nine days after Abigail was initially detained, she filed an unopposed motion for a review hearing and argued that her detention was no longer warranted.

The superior court held the review hearing on January 30 — 11 days after Abigail's initial detention. The State presented a counselor from the Kodiak hospital as its sole witness. The counselor had interviewed Abigail on four separate days during her detention, including the day of the hearing. He testified that, in his opinion, Abigail still met the criteria for emergency hospitalization and continued to be a danger to herself. Relying on his review of Abigail's medical records and information from other clinicians, the counselor explained that Abigail had a long history of sudden mental health crises requiring restraint and the administration of medication. He also stated that Abigail had continued to express suicidal ideation as recently as the morning of the hearing, but he did not believe she had a present plan to follow through.

The counselor further testified that Abigail was doing "a lot better" since she was admitted; she had "significantly calmed down" and did not have "any other incidents requiring restraints." He attributed most of her improvement to the Haldol injection administered soon after she arrived at the hospital; he noted that the effects last "sometimes a week to a week and a half" and she had not yet needed another dose. But "when that medication wears off, [a person] . . . could become psychotic very quickly." He assessed Abigail as "fairly pleasant" and explained that she had "been writing down some coping skills and doing some coloring," but she also "sometimes start[ed] to cry." In his opinion releasing Abigail from the hospital was "moderate to high risk" and "it's best to get someone set up on medication and have them stable and observed for a period of time" to ensure the medication is working.

Regarding the availability of evaluation facilities, the counselor explained that Abigail was third on the wait list at Alaska Psychiatric Institute (API) in Anchorage but Bartlett Regional Hospital in Juneau could accept her as soon as the Kodiak hospital could "set up transportation[,] which usually takes a day or two." He also testified that the Kodiak hospital staff had tried to place Abigail at other facilities in Fairbanks and Anchorage, but those facilities could not accept her.

Abigail then testified on her own behalf. She said she felt that she had stabilized since she first arrived at the hospital; she had identified triggers for negative thoughts and written down those triggers, her post-discharge goals, and different coping skills such as breathing, going for a walk, stretching, and yoga. Abigail agreed there was a valid concern about self-harm when she was initially detained, but she stated that she no longer had any intention of harming herself and that "today is a definite change from when I came in."

Both Abigail and the counselor also testified that Abigail was taking other medications for her condition in addition to the initial Haldol shot: Abilify, an anti-

psychotic; Prozac, an anti-depressant; and Ativan, an anxiety medication. According to Abigail, she had not been prescribed Abilify before she was detained at the Kodiak hospital. Abigail explained that after discharge, she planned to return to her family in Akiak where she could obtain prescription refills and access outpatient therapy.

Once testimony and closing arguments were completed, the judge issued an oral ruling on the record. The court attributed Abigail's improvement primarily to the Haldol injection, which would soon wear off, and noted that "there's been no testimony at this point that [the] medications are sufficient to prevent a relapse of the condition that brought [Abigail] back to the hospital." Additionally, the court found that there was no evidence to "create some confidence" that the medications and coping mechanisms combined would prevent Abigail from "immediately . . . spiral[ing] down into self harm." And the court noted that Abigail had expressed suicidal ideation "as recently as this morning." Although Abigail had improved, the court determined that her condition had not yet "reached a period of stability." The court thus concluded that there was probable cause to believe that Abigail's condition would "re-emerge" if she were released and found that there was no less restrictive alternative than detention at the Kodiak hospital. The court also stated that it was "sufficient to meet constitutional requirements for due process to have this review hearing and to check the status of the evidence to make sure that it at least meets the threshold for . . . the initial detention."

The court then scheduled another review hearing 48 hours later "to see whether there's been any evidence of marked improvement, marked deterioration, or whether the State has had an opportunity to . . . initiate the 72-hour evaluation." On February 1, two days after the initial review hearing and 13 days after the State initially detained Abigail, she was transported to Bartlett Regional Hospital in Juneau for an evaluation. Bartlett released Abigail on February 3 after staff determined she did not meet the criteria for involuntary commitment.

### C.    Jethro's Pre-Evaluation Detention

Jethro brought himself to the emergency room at Central Peninsula Hospital in Soldotna on May 7, 2019, to seek help for an acute episode of schizophrenia. Jethro was homeless at the time. He was struggling with psychosis and a significant traumatic brain disorder, and had lost access to medications that helped stabilize him. Jethro had been hospitalized at the Soldotna hospital on multiple previous occasions due to these conditions.

A physician at the Soldotna hospital sent the court notice of Jethro's pre-evaluation detention, indicating the physician's belief that Jethro was mentally ill and there was probable cause Jethro would likely seriously harm himself or others because Jethro was "suicidal, potentially homicidal." A counselor then filed a petition to hospitalize him for evaluation. The counselor believed Jethro to be mentally ill and "in danger of physical harm" to himself "if he is not placed in a protective environment." The counselor noted that Jethro had "command hallucinations tell[ing] him to kill himself" and a "persecutory voice in his head" telling him to harm himself or others, "for example by stealing a car and running it into a wall." The petition also recounted Jethro's reports that he was "seeing people with guns hiding in the trees placed there by the government to watch his every move."

That same day, a master reviewed the petition and recommended that it be granted based on probable cause findings that Jethro was mentally ill and gravely disabled. The master's recommendation directed the State to file daily status reports if Jethro could not be transported to an evaluation facility within 24 hours. The superior

court approved the master's recommendation and ordered an attorney appointed for Jethro the next day.[10]  However, Jethro's last name was spelled incorrectly on the order.

Jethro remained detained at the Soldotna hospital due to lack of evaluation facility capacity, despite the superior court's order that he be delivered "immediate[ly]" to such a facility.  Thirteen days after Jethro was initially detained, he filed a partially unopposed motion for a review hearing and argued that his detention was no longer warranted.

A master held a review hearing on May 24 — 17 days after Jethro's initial detention.  The State presented a social worker from the Soldotna hospital as its sole witness.  The social worker had interviewed Jethro multiple times during his current stay and was familiar with some of his prior hospitalizations.  She believed that Jethro still needed to be evaluated at API because the Soldotna hospital providers and his outpatient providers would not be prepared to administer the necessary medications.  And Jethro had not yet seen a psychiatrist or psychiatric nurse practitioner, so he had not yet been prescribed the appropriate doses of his medications.  The social worker explained that there was "a huge deficit in psychiatric providers" and no psychiatrist on the Kenai Peninsula; the only psychiatrist who the social worker was familiar with in the area worked with the Alaska Native Medical Center and came only "once a month for a day."  She also testified that the hospital had not tried to arrange a visit with a psychiatric provider through telemedicine because it didn't "have that ability," which was "actually embarrassing for [it] at this point."

Especially given Jethro's history of decompensation without medication and the fact that he was homeless, the social worker believed discharging him might lead

---

**10**    *See* AS 47.30.700(a) (establishing initial involuntary commitment procedures, including mandatory appointment of counsel for respondent).

to self-harm or an inability to care for himself. She emphasized that when he decompensates "[h]e tries very, very, very hard not to harm himself or others, but he gets to the place where that's a serious danger"; however, she was not sure how long it would take for Jethro to decompensate if released. On cross-examination the social worker explained that she did not believe Jethro had hurt himself or others while at the hospital, nor had he expressed any current intent to do so, but he had been self-harming "significant[ly]" immediately prior to his arrival. She also testified that Jethro was taking care of his activities of daily living with help from staff at the hospital. The social worker felt that she had a "pretty good rapport" with Jethro and thought he was "pretty honest . . . about his struggles."

Jethro then made a short statement, explaining that while it was "a little bit out of [his] league," he didn't believe it was necessary for him "to be at API to be evaluated by a psychiatrist when" his primary care provider could "reasonably stabilize [his] medication."

After testimony and closing arguments, the master made findings on record, recommending that the court uphold the initial hospitalization order. The master began by finding that Jethro already would have been transported to API, but for the typographical error misspelling Jethro's last name in the order authorizing hospitalization for evaluation. The master then explained that while Jethro "certainly ha[d] fundamental liberty interests at stake," the State also had interests in protecting both him and the community. The court held that Jethro continued to meet the detention criteria, because Jethro's recent stabilization was temporary and due to his hospitalization. The court found that Jethro was "gravely disabled based on . . . his medical diagnoses and the statements that he made when he was interviewed at [the hospital]. We need the evaluation so that he can be treated and safely be released."

The master found the evidence presented was sufficient to meet both the probable cause standard for ex parte proceedings,[11] and the clear and convincing evidence standard required for a 30-day commitment hearing.[12] The master followed his oral ruling with written recommendations, which were subsequently approved by the superior court.

Jethro was transported to API later that day. After the 72-hour evaluation period expired on May 29, Jethro voluntarily admitted himself to API. He was discharged the following day with a small supply of medication, a prescription for a month of medication, and a follow-up appointment in Kenai.

## D. Appeal

Abigail and Jethro appeal the superior court orders permitting their continued pre-evaluation detentions after review hearings. Both cases were stayed pending our resolution of *Mabel B.* After the stay was lifted we consolidated the cases "for the purposes of briefing and decision."

## III. STANDARD OF REVIEW

"We apply our independent judgment to the interpretation of the Alaska Constitution and the mental health commitment statutes and will adopt the rule of law that is most persuasive in light of reason, precedent, and policy."[13] We review factual

---

[11] AS 47.30.700(a).

[12] AS 47.30.735(c).

[13] *In re Hospitalization of Mabel B.*, 485 P.3d 1018, 1024 (Alaska 2021) (first quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 837 (Alaska 2014); and then quoting *In re Hospitalization of Naomi B.*, 435 P.3d 918, 924 (Alaska 2019)).

findings "for clear error and will reverse only if we have a definite and firm conviction that a mistake has been made."[14]

## IV. DISCUSSION

Abigail and Jethro argue that the lengthy delays between their pre-evaluation detentions and their transportation to an evaluation facility violated their substantive due process rights under the United States and Alaska Constitutions.[15] They contend their substantive due process rights were violated because the nature and duration of their pre-evaluation detentions were not reasonably related to the purpose of immediately transporting them to an evaluation facility. Additionally, Abigail and Jethro encourage us to adopt a presumption "that a pre-evaluation detention of seven days . . . violates substantive due process." Finally, they argue that we should "direct trial courts to use their inherent authority to impose sanctions for contempt when the state fails to perform a timely emergency evaluation."

### A. *In re Hospitalization of Mabel B.*

The circumstances of the State's detentions of Abigail and Jethro are similar to those addressed in our 2021 *In re Hospitalization of Mabel B.* decision.[16] In that consolidated case, like this one, the two respondents were detained while awaiting transportation for mental health evaluations, and they argued that the lengthy detentions violated their substantive due process rights.[17] The respondents' arguments in this appeal thus focus on the legal and factual similarities between the two cases.

---

[14] *In re Hospitalization of Mark V.*, 501 P.3d 228, 234 (Alaska 2021) (quoting *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262 (Alaska 2019)).

[15] U.S. Const. amend. XIV, § 1; Alaska Const. art. I, § 7.

[16] *In re Mabel B.*, 485 P.3d at 1020-23.

[17] *Id.*

Both respondents in *Mabel B.* were brought to local hospitals after they suffered psychiatric emergencies.[18]  In each instance hospital employees petitioned the superior court for an order authorizing hospitalization for evaluation, and the court granted the order.[19]  Each order required the State to "arrange for immediate delivery" of the respondent to an evaluation facility.[20]  But the respondents were not immediately transported for evaluation due to the lack of facility capacity, and they remained detained in the hospitals while awaiting mental health evaluations.[21]

One respondent requested a review hearing 14 days after the order authorizing hospitalization for evaluation was issued.[22]  The superior court held the requested hearing two days later to address whether the respondent's detention was still warranted.[23]  The respondent suffered from dementia, and a consulting psychologist at the hospital testified that while the respondent's condition had not changed, treatment at API was not likely to "be fruitful."[24]  Despite expressing "real misgivings" about the respondent's "predicament," the court permitted the respondent's continued detention.[25]

---

[18]  *Id.* at 1019, 1021-22.

[19]  *Id.*

[20]  *Id.*

[21]  *Id.* at 1021-23.

[22]  *Id.* at 1021.

[23]  *Id.*

[24]  *Id.*

[25]  *Id.* at 1021-22.

The respondent was transported to API for evaluation that day and was released four days later after API staff determined she no longer met the commitment criteria.[26]

The other respondent in *Mabel B.* requested a review hearing six days after the order authorizing hospitalization was issued, and the superior court held the hearing two days later.[27] Hospital staff testified that they believed the respondent still met the criteria to be held for an evaluation, despite acknowledging that they "d[id] not have the expertise . . . to make assessments and judgments in complex cases" like the respondent's.[28] Staff also noted that the respondent had not followed through on outpatient mental health treatment in the past.[29] The respondent then testified, explaining that "she had her health issues 'under control' and had no intention of hurting herself."[30] The court was "disheartened" because no referrals had been made to potentially available evaluation facilities, but it nonetheless concluded that the respondent's detention was still necessary.[31]

Subsequently, the respondent requested a second review hearing, which the court held seven days after the first.[32] A crisis clinician testified that the respondent was still a danger to herself, and a social worker testified that she had contacted two other

---

[26]     *Id.* at 1022.

[27]     *Id.*

[28]     *Id.* (alterations in original).

[29]     *Id.*

[30]     *Id.*

[31]     *Id.* at 1023.

[32]     *Id.*

evaluation facilities but neither had any beds available.[33] The respondent then testified once more, "explaining that she was no longer suicidal and that she had support systems in place upon discharge."[34] The court again permitted the respondent's continued detention, despite expressing concerns about the delayed evaluation.[35] The respondent was transported to API for evaluation three days later.[36] API staff petitioned for a 30-day commitment, but the respondent was discharged before the commitment hearing was held.[37]

Both respondents appealed the State's involuntary pre-evaluation detentions, contending that "their substantive due process rights were violated when they were held in hospitals for over two weeks before being admitted to API for evaluation."[38] We first held that under the United States and Alaska Constitutions, substantive due process "at the least . . . requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[39] We also explicitly "decline[d] to set an exact time at which a pre-evaluation detention becomes

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.* at 1023, 1025.

[39] *Id.* at 1025 (alteration in original) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).

so long that it violates due process"[40] because asserted due process violations are "to be tested by an appraisal of the totality of facts in a given case."[41]

Turning to the purpose of the detentions, we explained that the respondents "were detained solely for the purpose of 'immediate delivery' to an evaluation facility to determine whether they met the standards for involuntary commitment to a treatment facility."[42] Despite this sole purpose for the orders, the State used them "to detain the respondents for almost six times as long as the evaluation period" and "nearly as long as the commitment that could be ordered at the end of the evaluation."[43] "The State's only explanation for the length of respondents' pre-evaluation detentions was API's lack of capacity, which [wa]s an insufficient justification in this case."[44] Evaluating "the totality of facts in [each] given case," we concluded "there was no reasonable relation between the limited purpose of the evaluation orders and the extended duration of the respondents' confinements."[45] Because the State's "unreasonably lengthy detentions of [respondents] violated their substantive due process rights," we vacated the orders permitting their continued detention.[46]

---

[40]    *Id.* at 1026.

[41]    *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)).

[42]    *Id.* (citing AS 47.30.705-.730).

[43]    *Id.*

[44]    *Id.*

[45]    *Id.* (quoting *Lewis*, 523 U.S. at 850).

[46]    *Id.* The respondents also argued that under the Alaska Constitution, their detentions needed to "be justified by a compelling state interest and no less restrictive alternative"; we did not decide that question "because we ultimately conclude[d] that the
(continued...)

**B.**     **Abigail's And Jethro's Detentions Violated Their Substantive Due Process Rights.**

Abigail and Jethro assert that, as in *Mabel B.*, the nature and duration of their detentions were not reasonably related to the limited purpose of facilitating immediate transportation for evaluation. The State responds by arguing that we should recognize broader purposes for pre-evaluation detention — despite *Mabel B.*'s suggestion to the contrary — and we should uphold the detentions in this case because their nature and duration were reasonably related to those broader purposes. We maintain our prior holding that the purpose for pre-evaluation detention in this context is limited to facilitating immediate transport to an evaluation facility, and we conclude that the State's detentions of Abigail and Jethro violated their substantive due process rights because the restrictive nature and long duration of their respective detentions were not reasonably related to the limited purpose of transporting them for emergency evaluation.

**1.**     **The sole purpose of pre-evaluation detention is to facilitate immediate delivery to an evaluation facility.**

Abigail and Jethro emphasize *Mabel B.*'s determination that the respondents in that case were detained "solely for the purpose of 'immediate delivery' to an evaluation facility,"[47] and contend that nothing meaningfully distinguishes the purpose of their respective detentions from those at issue in *Mabel B.* In response, the State does not argue that *Mabel B.* should be overruled but instead maintains that it is an "outlier" and that, although we determined the sole allowable purpose of pre-evaluation detention

---

[46]     (...continued)
confinement in th[at] case fail[ed] to satisfy the less demanding 'reasonable relation' standard." *Id.* at 1025 n.49. Abigail and Jethro did not raise that argument in this case.

[47]     *Id.* at 1026.

*in that case*, broader purposes are relevant in these cases. These broader purposes, according to the State, include "protecting vulnerable people from harming themselves, protecting society from people who are dangerous to others, and providing treatment for people who are mentally ill and in need of care." Notably, in *Mabel B.* the State argued that functionally identical purposes justified the detentions in those matters and we rejected that argument and instead held that the sole allowable purpose of the detentions was " 'immediate delivery' to an evaluation facility."[48]

In the cases currently before us, the State contends we should evaluate the purpose of pre-evaluation detention differently because, in its view, detention is "more compelling" when the evidence of grave disability or danger to self or others meets at least the probable cause standard. But we did not assess this aspect of the respondents' detentions in *Mabel B.* when we determined their purpose; we instead referenced only the "legislative intent that the respondent . . . must be transported immediately to the nearest evaluation facility."[49] Abigail and Jethro correctly note that broadening the purpose of pre-evaluation detention beyond immediate transport would contradict *Mabel B.* Abigail and Jethro also point out that "[i]f a detention order serves purposes other than immediate transport for evaluation, it could extend indefinitely and no longer represent a preliminary determination for which the low threshold of probable cause is appropriate." The broader purposes identified by the State are undoubtedly relevant to the involuntary commitment framework as a whole. And we agree that respondents who have been detained may receive interim stabilizing care while awaiting transportation. But until a respondent receives an ordered evaluation, the parties are without important

---

[48]     *Id.*

[49]     *Id.* (quoting *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014)).

-18-                                                                7650

information about the respondent's condition and appropriate treatment, and unable to advance toward commitment proceedings meant to address the broader interests discussed by the State. Moreover, the massive curtailment of liberty at stake in the context of involuntary commitment makes preserving procedural protections at the pre-evaluation stage all the more important.[50] Therefore we agree with Abigail and Jethro that, as we recognized in *Mabel B.*, the sole purpose of pre-evaluation detention is limited to " 'immediate delivery' to an evaluation facility."[51] We decline to revisit that determination.

### 2. The nature and duration of Abigail's and Jethro's detentions were not reasonably related to the purpose of immediate delivery for evaluation.

With the sole purpose of pre-evaluation detention in mind, we turn to examine both the nature and the duration of Abigail's and Jethro's respective detentions.

Looking to the nature of their detentions, we note that, as in *Mabel B.*, both Abigail and Jethro were detained in hospital settings where hospital staff provided for their immediate needs, including administering their medications and providing counseling, and in Abigail's case, restraining her as necessary to prevent harm. Their detentions were involuntary. Although Jethro initially brought himself to the Soldotna

---

[50]  *In re Vern H.*, 486 P.3d 1123, 1129 (Alaska 2021).

[51]  *In re Mabel B.*, 485 P.3d at 1026 (citing AS 47.30.705-.730). As a practical matter, we recognize severe weather or other events or conditions may delay safe transportation to an evaluation facility, particularly for respondents in more remote areas of Alaska. *See, e.g.*, *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1187-88 (Alaska 2013) (involving respondent who remained in Haines jail for seven days awaiting transportation to Juneau hospital for emergency psychiatric evaluation). A weather-related delay or a natural disaster might lead to a longer detention duration, yet continue to reasonably relate to the purpose of immediate transportation for evaluation. However, those circumstances were not raised here; rather, the reason for the delay of Abigail's and Jethro's transportation was the evaluation facilities' lack of capacity.

hospital, both Abigail and Jethro were ultimately held involuntarily due to their respective conditions and due to the lack of available space in any facility that could perform the required evaluation of their mental health. According to their hospital treatment providers, both Abigail and Jethro continued to meet the probable cause standard for requiring evaluation at a qualified facility. The Kodiak hospital counselor testified that Abigail continued to be at risk for self-harm and required further evaluation. Similarly, the Soldotna hospital social worker who worked with Jethro believed he still needed to be evaluated at a qualified facility and that discharging him might lead to severe self-harm and place him at risk given his inability to care for himself. Neither hospital, however, could perform the full evaluation required to proceed further with involuntary commitment, and neither could provide treatment that was informed by a full evaluation. Abigail and Jethro nevertheless continued to experience severe curtailment of their liberties.

Looking next to the duration of the pre-evaluation detentions, Abigail was detained due to lack of capacity in evaluation facilities for 11 days before her review hearing and 13 days before her transportation for evaluation, while Jethro was detained prior to transportation for 17 days, 16 of which were due to lack of evaluation facility capacity. Abigail's pre-evaluation detention was slightly shorter than the detentions in *Mabel B.*,[52] but it was about twice as long as the maximum 6-day length of the evaluation

---

[52] *See In re Mabel B.*, 485 P.3d at 1021-23.

period that begins once the respondent arrives at the evaluation facility.[53] Jethro's pre-evaluation detention, on the other hand, was longer than both detentions in *Mabel B.*[54]

Evaluating "the totality of the facts,"[55] we conclude that the State's detention of Abigail and Jethro violated their substantive due process rights. Both detentions were protracted over many days. Both detentions were prolonged purely due to lack of capacity in an evaluation facility. Although both respondents received limited treatment while detained, that treatment took place in hospitals that could not meet the respondents' continued needs for emergency evaluation. We therefore hold that the nature and duration of Abigail's and Jethro's detentions did not reasonably relate to the purpose of immediate transportation to an evaluation facility.

In the alternative, the State asserts that the lengthy delay in transporting Jethro for evaluation was harmless because the superior court found that he met the detention criteria by clear and convincing evidence, and he ultimately voluntarily admitted himself to API. We disagree. A review hearing during pre-evaluation detention is not the same as a 30-day involuntary commitment hearing. Most importantly, we have repeatedly emphasized that commitments entail a "massive curtailment of liberty."[56] At a review hearing the respondent has not yet obtained a full

---

[53] *See* AS 47.30.715 (defining 72-hour evaluation period); AS 47.30.805(a)(1) (excluding holidays and weekends from 72-hour calculation).

[54] *See In re Mabel B.*, 485 P.3d at 1021-23, 1026.

[55] *Id.* at 1026.

[56] *See, e.g.*, *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 839 (Alaska 2014); *In re Stephen O.*, 314 P.3d at 1193; *see also In re Vern H.*, 486 P.3d 1123, 1129-30 (Alaska 2021) (distinguishing between pre-evaluation detention and commitment hearing based on "several procedural protections" protecting liberty interest at pre-evaluation detention stage).

mental health evaluation, so the court and the parties lack crucial evidence necessary to evaluate a respondent for 30-day commitment. Moreover, Jethro only remained at API for one day after he was voluntarily admitted, so had he been provided a timely evaluation, his overall detention period may have been significantly shorter. The delay in Jethro's evaluation was not obviated by the court's findings under the clear and convincing standard or by Jethro's eventual voluntary admission to API.

C. **We Decline To Adopt A Presumption That Any Specific Pre-Evaluation Detention Duration Violates Substantive Due Process.**

Abigail and Jethro ask us to depart from *Mabel B.* and hold "that a pre-evaluation detention of seven days presumptively violates substantive due process," instead of evaluating the totality of facts in each case. They suggest that a presumption would "promote uniformity in addressing" the systemic issues of prolonged detention and that a seven-day period would be consistent with our precedent. While Abigail and Jethro acknowledge we declined to set a length of time at which a pre-evaluation detention would become unconstitutionally long in *Mabel B.*, they contend we should establish a presumption with a set length of time in this case because their "appeals demonstrate the persistence of" systemic evaluation delays. The State urges us not to adopt a presumption, asserting that "[a] presumption is not only constitutionally inappropriate, but it is also unnecessary as a practical matter" because "courts are successfully evaluating the circumstances of each case and concluding that some pre-evaluation detentions violate due process."

On the record before us, we are not convinced that it is necessary to establish a presumption. Because the detentions here occurred almost two years before we decided *Mabel B.*, these appeals on their own do not indicate that *Mabel B.*'s approach of requiring "an appraisal of the totality of facts in a given case" is

unworkable.[57] At oral argument Abigail and Jethro cited data collected during a separate lawsuit against the State regarding evaluation delays, but that lawsuit was settled in 2020, again prior to our decision in *Mabel B*.[58] They also pointed out that API's wait list continues to be somewhat lengthy, suggesting that systemic evaluation delays may still occur. However, the record is devoid of evidence that trial courts, following our decision in *Mabel B.*, are not appropriately evaluating the circumstances of each case when evaluation delays happen.

Further, even if we were inclined to adopt a presumption, the record before us is insufficient to determine what amount of delay should be presumed to violate substantive due process or under what circumstances a presumption should apply.[59] We therefore continue to assess alleged substantive due process violations "by an appraisal of the totality of facts in a given case."[60]

### D.    We Decline To Require That Trial Courts Impose Particular Sanctions Against The State.

Abigail and Jethro further argue that we should "direct trial courts to use their inherent authority to impose sanctions for contempt when the State fails to perform a timely emergency evaluation." They specifically contend we should "direct trial courts to order . . . a daily fine against the state of $500 per individual respondent still detained

---

[57]    *In re Mabel B.*, 485 P.3d at 1026 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850(1998)).

[58]    *See id.* at 1020 n.15; *Disability Law Ctr. of Alaska, Inc. v. State*, No. 3AN-18-09814 CI (Alaska Super., Aug. 27, 2020).

[59]    *Accord Trueblood v. Wash. Dep't. of Soc. & Health Servs.*, 822 F.3d 1037, 1045-46 (9th Cir. 2016) (holding that any deadline for pretrial competency evaluations established by the district court should be based upon constitutional reasonableness standards and comparable state policy, in addition to what is feasible and achievable).

[60]    *In re Mabel B.*, 485 P.3d at 1026 (quoting *Lewis*, 523 U.S. at 850).

awaiting emergency evaluation . . . seven days after the ex parte order issues," and they suggest that the fines should be "held for the benefit of class members and for the development of additional resources for emergency evaluations." The State disagrees, urging us to reject the "request to transfer . . . the legislature's power of the purse [to the courts] in the guise of court fees."

Abigail and Jethro rely primarily on *Trueblood v. Washington State Department of Social & Health Services*[61] to support their argument. That case was a class action in which a federal district court required Washington State to provide restoration services within seven days to jailed class members who were found incompetent to stand trial in their criminal cases.[62] When the State failed to comply with the order, the court began issuing fines "for the benefit of class members."[63] This is not a class action, so *Trueblood*'s procedural posture bears little resemblance to this case. And we are not persuaded on this record that we should direct trial courts to order particular fines in future cases.

As Abigail and Jethro note, Alaska's trial courts possess the power to impose sanctions for contempt under certain circumstances. For example, AS 09.50.010(5) provides that "disobedience of a lawful . . . order . . . of the court" can constitute contempt. Alaska Civil Rule 90 sets forth the procedure to be followed: In general, "upon a proper showing on ex parte motion supported by affidavits, the court shall [as one option] order the accused party to show cause . . . why the accused party

---

[61]    822 F.3d 1037.

[62]    No. 2:14-cv-01178-MJP, 2016 WL 3632486, at *1-2 (W.D. Wash. July 7, 2016).

[63]    *Id.* at *1, *9.

should not be punished for the alleged contempt."[64] Neither Abigail nor Jethro requested contempt sanctions under Rule 90 in the trial court, so we express no view on whether sanctions could or should have been imposed in these cases.

## V.    CONCLUSION

We VACATE the superior court orders authorizing the State's continued pre-evaluation detention of Abigail and Jethro following their review hearings.

---

[64]    Alaska R. Civ. P. 90(b).