*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court Nos. S-17292/17335 (Consolidated) |
| MABEL B. | ) ) | Superior Court No. 3AN-18-02636 PR |
| | ) | O P I N I O N |
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | No. 7525 – May 7, 2021 |
| SARAH D. | ) ) | Superior Court No. 3AN-18-03153 PR |

Appeal in File No. S-17292 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una S. Gandbhir, Judge. Appeal in File No. S-17335 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Josie Garton, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Beth Goldstein, Acting Public Defender, Anchorage, for Mabel B. and Sarah D. Laura E. Wolff, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.

## I.     INTRODUCTION

Two women were hospitalized following psychiatric emergencies. In each instance hospital staff petitioned the superior court for an order authorizing hospitalization for evaluation, and the superior court granted the order. But the women were not immediately transported for evaluation because no beds were available at Alaska Psychiatric Institute (API). Each woman eventually brought a motion for a review hearing to determine whether continued detention in a hospital was proper; in each case the superior court allowed continued detention. The women were finally transported to API more than 14 calendar days after their initial detentions. On appeal they argue that their continued detention before being moved to API for evaluation violated their due process rights. We agree.

## II.     FACTS AND PROCEEDINGS

### A.     Statutory Framework And The Capacity Of Mental Health Facilities In Late 2018

Alaska law provides procedures for the involuntary commitment of certain individuals with mental illness.[1] Any adult can petition the superior court alleging that another individual "is reasonably believed to present a likelihood of serious harm to self or others or is gravely disabled as a result of mental illness."[2] If the court finds there is "probable cause to believe the respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others," it may issue an ex parte order and direct a peace officer to "deliver the

---

[1]     *See generally* AS 47.30.700-.815 (detailing involuntary commitment procedures).

[2]     AS 47.30.700.

respondent to the nearest appropriate facility for emergency examination or treatment."[3] Alternatively, in the case of an emergency:

> A peace officer . . . who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures set out in AS 47.30.700, may cause the person to be taken into custody and delivered to the nearest evaluation facility. . . . The peace officer or mental health professional shall complete an application for examination of the person in custody and be interviewed by a mental health professional at the facility.[4]

A mental health professional and physician at the evaluation facility must evaluate the respondent within 24 hours of arrival.[5] If the mental health professional "has reason to believe that the respondent is (1) mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others, and (2) is in need of care or treatment," then the mental health professional must petition for an ex parte order under AS 47.30.700 authorizing hospitalization for evaluation;[6] this petition is evaluated under the probable cause standard.[7]

Upon receiving an order authorizing hospitalization for evaluation, the facility "shall accept the order and the respondent for an evaluation period not to exceed

---

[3]     AS 47.30.700(a).

[4]     Former AS 47.30.705(a) (2018).

[5]     Former AS 47.30.710(a) (2018).

[6]     AS 47.30.710(b).

[7]     AS 47.30.700(a).

72 hours."[8] While the relevant statutes do not explicitly create any time limits between the ex parte order and transport to the facility, we have held that the statutory framework "evidence[s] a legislative intent that the respondent who is subject to an emergency ex parte order must be transported immediately to the nearest evaluation facility so that the 72-hour evaluation period can begin without delay."[9] During the 72-hour evaluation period, two mental health professionals at the facility may petition for a 30-day commitment to a treatment facility.[10] If the court receives such a petition, it must hold a hearing to determine whether the 30-day commitment is warranted by clear and convincing evidence.[11]

The 72-hour evaluations are done only at certain designated facilities.[12] In 2018 API in Anchorage, Bartlett Regional Hospital in Juneau, and Fairbanks Memorial Hospital were designated facilities.[13] API is the largest of these designated facilities.[14] As of October 2018 API had a physical capacity of 80 beds: 50 for adult acute care, 10 for adolescent care, 10 for long-term adult care, and 10 for forensic care. But the

---

[8] AS 47.30.715.

[9] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[10] AS 47.30.730(a).

[11] AS 47.30.735.

[12] *See* AS 47.30.915(7).

[13] *See* Pamela Cravez, *Alaska's Lack of Psychiatric Beds and Consequences*, 34 ALASKA JUST. F. 5, 5 (Summer 2017). As of 2016, two other facilities (Ketchikan PeaceHealth Medical Center and Yukon-Kuskokwim Delta Regional Hospital in Bethel) sometimes have available resources to perform 72-hour evaluations, but coverage is reportedly inconsistent. *See* SARA GORDON ET AL., REVIEW OF ALASKA MENTAL HEALTH STATUTES 18 (2016).

[14] *See* Cravez, *supra* n.13, at 5.

"functional capacity is inextricably linked to staffing levels," and there are severe shortages in staffing. The full nursing staff would require 118 psychiatric nursing assistants and 74 nurses; API had 72 nursing assistants and 33 nurses in October 2018.[15]

### B.    Mabel's Involuntary Commitment Proceedings

Mabel[16] suffers primarily from dementia. In October 2018, on the day she was supposed to move to Arkansas with her daughter, Mabel allegedly refused to go to the airport and started walking from her daughter's home in Anchor Point toward Homer. According to the emergency petition, she was found by an Alaska State Trooper on the roadside. The officer brought her to Central Peninsula Hospital and filed an emergency detention notice and evaluation application.[17]

That evening, a mental health professional at Central Peninsula filed an evaluation petition.[18] A few hours later, at 12:25 a.m. on October 10, a magistrate judge issued an order authorizing hospitalization for evaluation,[19] finding that there was probable cause to believe that Mabel was mentally ill and gravely disabled. The court ordered that the State "shall arrange for [Mabel's] immediate delivery" to the first

---

[15]    In 2018 the Disability Law Center sued the State regarding the delays in transport to evaluation facilities on which the superior court issued an injunction. *See Disability Law Center of Alaska, Inc. v. State*, Nos. 3AN-18-02687/00088 PR, 3AN-18-09814 CI (Alaska Super., Oct. 21, 2019). This litigation has since been settled. *See Disability Law Center of Alaska, Inc. v. State*, No. 3AN-18-09814 CI (Alaska Super., Aug. 27, 2020).

[16]    We use pseudonyms to protect the parties' privacy.

[17]    The officer acted pursuant to AS 47.30.705.

[18]    The mental health professional filed the evaluation petition pursuant to AS 47.30.710(b).

[19]    The magistrate judge issued the order pursuant to AS 47.30.700(a). The superior court affirmed this order on October 15.

available bed at API, Bartlett Regional Hospital, or Fairbanks Memorial Hospital for examination and evaluation. It required daily status reports until Mabel was transported to an evaluation facility, which had to include Mabel's location, the reasons for the delay in transport, steps the State was taking to ensure continued detention was necessary, and any other evaluation options.

Mabel was not immediately transported because "[t]he authorized evaluation facility d[id] not have capacity to accept the respondent." On October 24, 14 calendar days after the order authorizing evaluation, Mabel requested a review hearing, arguing that she no longer met the criteria for involuntary commitment or, if she did, that she should be evaluated immediately. Relying on *In re Hospitalization of Gabriel C.*,[20] she asserted that "[a]n immediate hearing is needed to address the question of whether continued detention is warranted and whether there is a less restrictive alternative available." In its response, the State indicated that it was "earnestly and actively working on trying to improve th[e] situation [at API] through a number of different approaches." It provided to the court a report with its plans for decreasing delays, stating it had hired additional staff and was considering adding more units and opening beds at other facilities.

The court held a review hearing on October 26 to address "whether continued detention [was] warranted." Mabel argued "that her substantive due process rights ha[d] been violated by being held for 17 days without review" and that the court should apply the clear and convincing evidence standard to determine whether continued detention was proper. A consulting psychologist from Central Peninsula testified that

---

[20] *See* 324 P.3d 835, 838 (Alaska 2014) ("[W]e take this opportunity to stress that the assigned judicial officer should not hesitate to take appropriate action to expedite an evaluation if the respondent cannot be transported to the initially designated facility without delay.").

"[Mabel's] condition ha[d]n't changed" and that the hospital had no reason to petition the court to withdraw the order. The psychologist was "skeptical that the treatment [at API] will be fruitful" but asserted that Central Peninsula could not perform an evaluation.

The court issued an order later that day stating that the burden was on the State to show that Mabel "still meets criteria for evaluation upon a review being requested due to delay." The court noted that the statute did not specify what standard is proper for review hearings before transportation to the evaluation facility, presuming that "the current shortage of placements and resulting delay in transportation were not contemplated when the statutes were enacted." The court determined that the review hearing was more similar to an ex parte hearing than a commitment proceeding and thus applied the probable cause standard, finding that standard had been met.[21] The court stated it

> has real misgivings about [Mabel's] predicament. A court order is not being followed, and as a result, transportation and evaluation has been delayed beyond any reasonable expectation, without any steps toward improving her mental health, through absolutely no fault of her own and without her consent. Although neither party raised the question directly, the Court has asked itself whether dismissal of the case is the remedy for this transgression of a respondent's rights, based simply on the fundamental constitutional liberty interests at stake when transportation is delayed. This analysis in turn requires a standard of determination of the timeframe for an unacceptable delay, since our statutes and case law do not address it.

But the court ultimately "decline[d] to reach these larger issues in this particular case" and found probable cause "to justify a 72-hour evaluation."

---

[21] The court also noted that applying the clear and convincing evidence standard "would amount to a 'pre-commitment' commitment hearing" of which a later judge could potentially take judicial notice.

Mabel was transported to API later in the day on October 26. API personnel evaluated Mabel and released her on October 30, finding that she no longer met the commitment criteria.

### C.    Sarah's Involuntary Commitment Proceedings

On December 17, 2018, Sarah was brought to Mat-Su Regional Medical Center by emergency medical services after an overdose. She initially stated she had attempted suicide, but later denied memory of overdosing. She had a history of depression and post-traumatic stress disorder (PTSD) and had been brought to the hospital for suicidal ideation twice in the past month. A physician petitioned the superior court for an evaluation order.[22] The court issued the order on December 20,[23] finding there was probable cause that Sarah was mentally ill and likely to cause serious harm to herself. It ordered that the State "shall arrange for immediate delivery" of Sarah to the "first available" evaluation facility for examination and evaluation.

Sarah was not transported because API did not have the capacity. On December 26 Sarah filed an expedited motion for a review hearing of her continued detention. She argued the State had to prove by clear and convincing evidence that she met the commitment criteria "given the length of time that her liberty ha[d] been deprived."

The review hearing was held on December 28. A social worker from Mat-Su Regional testified that Sarah was a danger to herself when she came into the hospital. He explained that while someone is held in custodial hospital detention awaiting transport, a clinician does a daily risk assessment "to determine the continuing appropriateness . . . for remaining on an ex parte or an involuntary hold." The most

---

[22]    The physician filed the petition pursuant to AS 47.30.710(b).

[23]    The superior court issued the order pursuant to AS 47.30.700(a).

recent risk assessment in Sarah's file, from December 26, indicated that she still met the hold criteria. A Mat-Su Regional doctor testified that Sarah continued to meet the criteria for custodial hospital detention because she still presented a danger to herself. He indicated that Mat-Su Regional "d[id] not have the expertise . . . to make assessments and judgments in complex cases" such as this one, which was why she needed to go to API. Another social worker then testified that she had contacted two other facilities in Anchorage but neither would accept Sarah. She had not contacted Bartlett Regional Hospital, Fairbanks Memorial Hospital, or PeaceHealth Ketchikan Medical Center. She testified that Sarah had shown interest in outpatient mental health treatment but had not followed through on such treatment in the past. She also testified Sarah had shown interest in an assisted living facility, but none would accept her. The social worker ultimately felt it was important for Sarah to get "a comprehensive psychiatric evaluation."

Sarah testified that she had her health issues "under control" and had no intention of hurting herself. Sarah said she was in the process of getting set up for treatment at Mat-Su Behavioral Health; she had an outpatient appointment on January 4, 2019, which was the final step before getting an appointment scheduled with a therapist; and she had started taking Lexapro, an antidepressant medication. Finally, she testified that she wished to move into an assisted living facility because of her physical illnesses — multiple sclerosis and general dystonia, a neuromuscular disorder — and the fact that her personal care assistant was inconsistent.

The superior court was "disheartened to hear that no referrals were made to Bartlett or to Fairbanks or to Ketchikan" and found it was "unacceptable" not to contact those other facilities because Sarah "need[ed] to be transported to the first available facility without delay" instead of remaining at Mat-Su Regional where she was not "receiving any treatment or services." But the court found probable cause that a 72-

hour evaluation was still necessary. The court was especially concerned that Sarah did not yet have a therapist and that she might be unable to follow a safety plan. The court therefore maintained the order and specified "that Mat-Su [Regional] must immediately contact Bartlett and Fairbanks and Ketchikan and any other available facilities to have her evaluated without delay." The court also stated that Sarah had to be transported to Mat-Su Behavioral Health for the screening appointment on January 4 if she was not receiving treatment by that date and ordered the State to draft a proposed transport order to that end.

On January 2 Sarah filed a motion for a status hearing and second review hearing to determine "whether the transport [to her January 4 appointment] [was] in place, as well as whether continued detention [was] warranted, and whether there [was] a less restrictive alternative available." The court signed an order requiring Mat-Su Regional to arrange for Sarah's transport to Mat-Su Behavioral Health for her intake appointment the following day. The State indicated there was no mechanism to transport her off hospital grounds as an inpatient, so the hospital would discharge her before transport. The court also scheduled a review hearing for January 4.

At the review hearing the parties discussed whether Sarah still met the hold criteria. A crisis clinician at Mat-Su Behavioral Health testified that Sarah was still a danger to herself. Next, a social worker at Mat-Su Regional testified that she had contacted Bartlett and Fairbanks Memorial and neither had a bed available for Sarah. An employee at Su-Valley Care Coordination in charge of Sarah's care testified regarding some of the barriers to finding Sarah an assisted living placement, including her age and required level of care. Sarah then testified, explaining that she was no longer suicidal and that she had support systems in place upon discharge. Sarah did not attend her outpatient appointment that day. There was some disagreement about who canceled the

appointment — the hospital believed Sarah canceled it but she denied doing so. Sarah said she would reschedule upon discharge and seek outpatient treatment.

In closing argument the State maintained that the applicable evidentiary standard was still probable cause, but Sarah argued it should be clear and convincing evidence because of "the fundamental liberty interest involved and the length of the delay." The court expressed concern that Sarah remained in the same position on the API waitlist that she had occupied during the hearing the week before, but it found there was probable cause that Sarah posed a substantial risk to herself based on her recent behavior, and therefore maintained the ex parte order authorizing hospitalization evaluation. The court did acknowledge "that this conduct becomes increasingly stale" and "at some point the deprivation of liberty is significant enough that it converts to clear and convincing evidence." It accordingly scheduled another review hearing for January 8.

Sarah arrived at API on January 7. On January 10 two mental health professionals at API petitioned for 30-day commitment. The parties stipulated to a continuation of the commitment hearing until January 14.[24] Sarah was discharged on January 14 before the commitment hearing could be held.

D.    Appeal

Mabel and Sarah now appeal their involuntary detentions, asserting that the lengths of their pre-evaluation custodial detentions violated their due process rights.

---

[24]    The parties did so pursuant to AS 47.30.725(f) (providing commitment hearing may only be postponed until seven calendar days after arrival at facility).

## III. STANDARD OF REVIEW

"We apply our independent judgment to the interpretation of the Alaska Constitution and the mental health commitment statutes"[25] and will "adopt[] 'the rule of law that is most persuasive in light of reason, precedent, and policy.' "[26]

## IV. DISCUSSION

Mabel and Sarah argue that the length of their detentions prior to evaluation violated their substantive due process rights under the Alaska and United States Constitutions. The State argues that there was no violation of substantive due process under the Alaska Constitution and implies that there can therefore be no federal violation.

The federal doctrine of substantive due process is defined as "[t]he doctrine that the Due Process Clauses of the 5th and 14th Amendments require legislation to be fair and reasonable in content and to further a legitimate governmental objective."[27] The U.S. Supreme Court has recognized that "[t]he Due Process Clause guarantees more than fair process";[28] it "also includes a substantive component."[29] "Substantive due process focuses on the result of governmental action, not its procedures," meaning that it

---

[25]    *In re Gabriel C.*, 324 P.3d at 837.

[26]    *In re Hospitalization of Naomi B.*, 435 P.3d 918, 924 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 764 (Alaska 2016)).

[27]    *Substantive Due Process*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[28]    *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).

[29]    *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

"imposes limits on what a state may do regardless of what procedural protection is provided."[30]

Alaska has a long history of substantive due process jurisprudence. In one of our foundational decisions, we explained:

> Substantive due process is denied when a legislative enactment has no *reasonable relationship* to a legitimate governmental purpose. It is not a court's role to decide whether a particular statute or ordinance is a wise one; the choice between competing notions of public policy is to be made by elected representatives of the people. The constitutional guarantee of substantive due process assures only that a legislative body's decision is not arbitrary but instead based upon some rational policy.
>
> A court's inquiry into arbitrariness begins with the presumption that the action of the legislature is proper. The party claiming a denial of substantive due process has the burden of demonstrating that no rational basis for the challenged legislation exists. This burden is a heavy one, for if any conceivable legitimate public policy for the enactment is apparent on its face or is offered by those defending the enactment, the opponents of the measure must disprove the factual basis for such justification.[31]

The "heavy" burden is on the party challenging the state action to show that it does not meet this test.[32]

---

[30]    16C C.J.S. *Constitutional Law* § 1821 (2020).

[31]    *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974) (emphasis added) (footnotes omitted).

[32]    *Id.*

The Supreme Court addressed substantive due process in the context of involuntary commitment in *Jackson v. Indiana*.[33] In that case, the defendant was charged with robbery but was found in his competency hearing to be incompetent to stand trial; he was committed to state custody to be held until he was competent.[34] He filed a motion for a new trial, arguing there was no evidence he would ever be sufficiently competent to stand trial and that "commitment under these circumstances amounted to a 'life sentence' without his ever having been convicted of a crime," which violated due process.[35] The Court held that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[36] Therefore, a defendant "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity [to stand trial] in the foreseeable future."[37] If a defendant will not soon be competent, then the State must start civil commitment proceedings or release the defendant.[38]

The Court of Appeals for the Ninth Circuit subsequently applied this "reasonable relation" standard in addressing "what happens when the state mental hospital[,] . . . which is charged with evaluating and treating mentally incapacitated

---

[33] 406 U.S. 715, 731-39 (1972).

[34] *Id.* at 717-19.

[35] *Id.* at 719.

[36] *Id.* at 738.

[37] *Id.*

[38] *Id.*

defendants, refuses to accept such defendants on a timely basis."**39**  Under Oregon law, a trial court may commit an incapacitated criminal defendant to the Oregon State Hospital, which in turn must evaluate the defendant within 60 days to determine if the defendant will be competent to stand trial in the foreseeable future.**40**  At the time, defendants were held in county jails for an average of one month before admission to the hospital for evaluation and treatment.**41**  The court recognized that, under *Jackson*, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."**42**  The court acknowledged that incapacitated individuals "have liberty interests in freedom from incarceration and in restorative treatment" and that "[l]ack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation."**43**  The court thus held that there was no "legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months" and determined that "the nature and duration of [the defendants'] incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals."**44**  The court "conclude[d] that [the hospital] violates the substantive due process rights of incapacitated criminal defendants when it

---

**39**     *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1105 (9th Cir. 2003).

**40**     *Id.* at 1105-06.

**41**     *Id.* at 1106.

**42**     *Id.* at 1122 (quoting *Jackson*, 406 U.S. at 738).

**43**     *Id.* at 1121 (second and third alterations in original) (quoting *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980)).

**44**     *Id.* at 1121-22.

refuses to admit them in a timely manner."[45] The Ninth Circuit again applied the reasonable relation standard a few years later, recognizing that due process requires "a 'reasonable relation' between the length of time from the court order to the inception of the competency evaluation."[46]

Mabel and Sarah argue that their substantive due process rights were violated when they were held in hospitals for over two weeks before being admitted to API for evaluation. We agree that, under both the Alaska and federal constitutions, due process, "at the least, . . . requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[47] We therefore apply the "reasonable relation" standard described above,[48] and we determine whether there was a "reasonable relation" between the nature and duration of Mabel's and Sarah's pre-evaluation detentions and the purpose of their detentions.[49] We hold that there was not.

---

[45] *Id.*

[46] *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1043 (9th Cir. 2016).

[47] *Jackson*, 406 U.S. at 738.

[48] *See id.* (establishing reasonable relation test).

[49] The appellants argue that the duration of their confinement must be justified by a compelling state interest and no less restrictive alternative. We have indeed applied these standards to involuntary commitments for mental health treatment. *In re Hospitalization of Naomi B.*, 435 P.3d 918, 933 (Alaska 2019). In this case, we need not determine whether the compelling state interest test applies to the duration of a respondent's pre-evaluation confinement because we ultimately conclude that the confinement in this case fails to satisfy the less demanding "reasonable relation" standard from *Jackson*.

We have previously recognized that the commitment statutes "evidence a legislative intent that the respondent who is subject to an emergency ex parte order must be transported immediately to the nearest evaluation facility so that the 72-hour evaluation period can begin without delay."[50] In this case, Mabel and Sarah were detained solely for the purpose of "immediate delivery" to an evaluation facility to determine whether they met the standards for involuntary commitment to a treatment facility.[51]

The evaluation itself is statutorily limited to a 72-hour period following the respondent's arrival.[52] This limited evaluation period is consistent with one of the guiding "principles of modern mental health care" that support the commitment statute: "that treatment occur as promptly as possible."[53] Even if a respondent is committed to a treatment facility, the commitment is of limited duration: the respondent must be released within thirty days, unless the professionals in charge of the treatment facility can prove that further commitment is warranted.[54]

Because "asserted denial [of due process] is to be tested by an appraisal of the totality of facts in a given case,"[55] we decline to set an exact time at which a pre-evaluation detention becomes so long that it violates due process. Here, the purpose of the orders at issue was to authorize "immediate delivery" of respondents to an evaluation

---

[50] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[51] AS 47.30.705-.730.

[52] AS 47.30.715-.725.

[53] AS 47.30.655(3).

[54] AS 47.30.730-.740.

[55] *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (quoting *Betts v. Brady*, 316 U.S. 455, 462 (1942)) (internal citations omitted).

facility for a 72-hour evaluation. The State, however, used these orders to detain the respondents for almost six times as long as the evaluation period. The respondents' detentions before the evaluation were nearly as long as the commitment for treatment that could be ordered at the end of the evaluation. The State's only explanation for the length of respondents' pre-evaluation detentions was API's lack of capacity, which is an insufficient justification in this case.[56] We thus conclude there was no reasonable relation between the limited purpose of the evaluation orders and the extended duration of the respondents' confinements. The State's unreasonably lengthy detentions of Mabel and Sarah violated their substantive due process rights.

## V.    CONCLUSION

We VACATE the superior court order allowing continued pre-transport hold of Mabel issued 16 days after the initial ex parte order. We VACATE the superior court's decision on the record to maintain Sarah's ex parte order more than 15 days after initially granting that order.

---

[56]    *Cf. Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) ("Lack of funds, staff, or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation.").