**NOTICE**

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) | Supreme Court No. S-17931 |
| AIDEN R. | ) ) | Superior Court No. 3AN-20-02045 PR |
| | ) ) ) | MEMORANDUM OPINION AND JUDGMENT* |
| | ) ) | No. 1969 – June 7, 2023 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Judge.

Appearances: Claire F. DeWitte, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Ryan A. Schmidt, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

A man was arrested and detained in jail. Two days later the criminal charges were dropped but the man remained in jail awaiting a court-ordered mental health evaluation. He remained jailed for 12 days awaiting transport to an evaluation facility. At no point did he request a review hearing. Following an evaluation at Alaska

---

\*      Entered under Alaska Appellate Rule 214.

Psychiatric Institute (API), mental health professionals petitioned for his involuntary 30-day commitment at API to treat his mental illness. After a hearing the superior court authorized that commitment.

The man appeals, arguing that the superior court plainly erred by not sua sponte ordering review hearings to monitor the legality of his continued pre-evaluation detention, and by not considering the effect of his extended pre-evaluation detention on his mental health when ordering that he be committed for treatment for 30 days. We hold that the court did not plainly err, and we affirm the superior court's orders.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

On September 21, 2020, Aiden R.[1] was arrested on robbery and assault charges and brought to the Anchorage Correctional Complex. Two days later a mental health professional on behalf of the Department of Corrections (DOC) simultaneously filed both a notice of emergency detention and application for evaluation, and a petition for an order authorizing Aiden's involuntary hospitalization for a mental health evaluation.[2] The petition for hospitalization for evaluation noted that Aiden was in custody for an evaluation and that a mental health professional had interviewed Aiden

---

[1]     We use a pseudonym to protect Aiden's privacy.

[2]     AS 47.30.700(a) (outlining process for petitioning superior court for order authorizing hospitalization of an individual for full evaluation of whether that individual meets civil commitment criteria); AS 47.30.705(a) (providing that peace officer, mental health professional, or certain other licensed physician may cause an individual to be taken into custody pending evaluation where there is "probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others of such immediate nature that considerations of safety do not allow initiation of involuntary commitment procedures set out in AS 47.30.700"). Alaska Statute 47.30.705(a) further provides that a person taken into custody pending evaluation "may not be placed in a jail or other correctional facility except for protective custody purposes and only while awaiting transportation to a . . . treatment facility."

that morning.[3]  In an email to the superior court master presiding over these filings, DOC also represented that the criminal charges against Aiden had been dismissed and that he "would be released today if the petition were denied."

DOC's petition for hospitalization for evaluation alleged that Aiden was "refusing all meals and medications," was "defecating on the floor," had "persecutory and grandiose delusions," and was "explosive" with DOC staff.  It further alleged that Aiden was "diagnosed with schizoaffective disorder, antisocial personality disorder, and polysubstance use disorder."  The petition asserted that Aiden was likely to cause serious harm to others due to his "persecutory delusions," his aggressive responses, and his statement that he would "[hurt] anyone who gets in [his] way."  According to the petition, Aiden was gravely disabled due to his refusal of food and medications, lack of sleep, disorientation, delusions, and aggression.  The detention notice made similar though less detailed assertions.

In response to these filings the master recommended that the petition for hospitalization for evaluation be granted.  The master noted that a mental health professional had already screened Aiden.[4]  The master determined there was probable cause to believe that Aiden was likely to cause serious harm to others due to delusions, aggression toward DOC staff, and threats of violence.  She further concluded there was

---

[3]    Alaska Statute 47.30.700(a) requires that upon a petition for hospitalization for evaluation, "a judge shall immediately conduct a screening investigation or direct [a qualifying mental health professional] to conduct a screening investigation of the person alleged to be mentally ill and, as a result of that condition, alleged to be gravely disabled or to present a likelihood of serious harm to self or others."

[4]    *See id.*; *In re Hospitalization of Meredith B.*, 462 P.3d 522, 528 (Alaska 2020) ("Upon receiving a petition to hospitalize a person for evaluation, the superior court is required to conduct a screening investigation or to order a mental health professional to do so." (citing AS 47.30.700(a)).

probable cause to believe that Aiden was gravely disabled because of his refusal of meals and medication, his defecating on the floor, and his inability to sleep.[5]

The superior court approved the master's recommendation, appointed an attorney for Aiden, and ordered his immediate delivery to the first available evaluation facility. The order further required DOC to file a status report if Aiden was not transported within 24 hours and to file additional updates every 24 hours until he was transported.

The Department of Health and Social Services (DHSS)[6] filed three status reports advising that evaluation facilities did "not have capacity" to accept Aiden. DHSS's next status report stated that Aiden had not been transported because he was "refusing COVID-19 screening" and that API was "working with DOC to plan for a safe admit as respondent had potential COVID-19 exposure." The status reports indicated that Aiden was expected to remain in jail "unless an appropriate less restrictive placement [was] identified." Neither Aiden nor his attorney objected or asked for a review hearing.[7]

On September 30, the day the original evaluation order was to expire, DOC moved to extend the order authorizing hospitalization for evaluation. DHSS also filed another status report noting that "DOC will have respondent quarantine in their facility due to COVID-19 exposure. API . . . is working with DOC on a safe plan to admit."

---

[5] AS 47.30.700(a) (requiring that court order for hospitalization for evaluation be based on probable cause determination that person is mentally ill and, as a result, is either gravely disabled or likely to cause serious harm to self or others).

[6] DHSS has since been restructured into the Department of Health (DOH) and the Department of Family and Community Services (DFCS). For purposes of this decision, we refer to the entity in place at the time, DHSS.

[7] *See In re Hospitalization of Vern H.*, 486 P.3d 1123, 1131 (Alaska 2021) (recognizing right of person detained in jail for mental health evaluation to request detention review hearing).

The extension motion largely alleged the same facts as the original petition. It stated that Aiden was likely to cause serious harm to others because of his threat to "shoot the [people] in the head" that he believed were out to get him, including police officers and DOC staff. It also alleged that Aiden was gravely disabled because he could not "identify where he would stay or how he would obtain food" upon release. The superior court approved the master's recommendation to grant the motion, and extended the order for seven days. Neither Aiden nor his attorney objected to this order or requested reconsideration.

Aiden remained in jail the next two days, and DHSS filed status reports. Both reports stated that Aiden was still refusing COVID-19 screening, that DOC would continue to quarantine him at the jail due to COVID-19 exposure, and that he would be transported to API by October 6. Aiden was transported and admitted to API the morning of October 5, 12 days after the original order authorizing hospitalization for evaluation had been granted.

Upon arrival at API Aiden initially attempted to get away and "was subsequently placed in a brief manual restraint, and . . . became combative and resistive." Staff moved him into locked seclusion, at which point Aiden "became physically aggressive toward staff and punched a staff member in the head."

Following Aiden's evaluation API staff filed a petition for a 30-day commitment for treatment.[8] The petition alleged that Aiden was diagnosed with schizoaffective disorder, had delusional thoughts, and behaved aggressively toward staff. The petition asserted that Aiden was likely to seriously harm others as evidenced by verbal threats and physical aggression toward staff. It also asserted that Aiden was

---

[8] AS 47.30.730(a) (allowing two mental health professionals that examined respondent during 72-hour evaluation period to file petition for 30-day commitment).

gravely disabled because without treatment he was "in danger of neglecting his basic needs."[9]

API also petitioned for court approval to involuntarily administer various psychotropic medications.[10] The API nurse practitioner who was treating Aiden stated in the petition that with these medications Aiden would "have continued improved impulse control, reduced aggression, and diminished agitation" as well as fewer delusions and a stabilized mood. The nurse practitioner asserted that no less intrusive options were available, that Aiden declined voluntary medications, that other methods had "not ameliorated [Aiden's] distressing symptoms," and that Aiden did "not appear to have the capacity to provide informed consent."

## B. Proceedings

A 30-day commitment hearing was held on October 7.[11] Aiden's API nurse practitioner testified. He testified that Aiden's "current diagnosis [was] schizoaffective disorder," which "represents a combination of both psychotic symptoms as well as mood symptoms." The nurse practitioner described some of Aiden's delusions, including "suggestions that he is himself a god" and "that he reported finding . . . two one-million-dollar bills." According to the nurse practitioner, Aiden was "able to provide select linear responses to direct questioning, but prolonged

---

[9] *See* AS 47.30.915(11) (defining "gravely disabled" as "a condition in which a person as result of mental illness (A) is in danger of physical harm arising from such complete neglect of basic needs for food, clothing, shelter, or personal safety as to render serious accident, illness, or death highly probable if care by another is not taken; or (B) is so incapacitated that the person is incapable of surviving safely in freedom").

[10] AS 47.30.839(a)-(b) (providing procedures to obtain court approval for administration of psychotropic medication to patient incapable of giving informed consent).

[11] AS 47.30.715 (requiring court to set 30-day commitment hearing to be held within 72 hours after respondent's arrival at evaluation facility), .735(a) (requiring court to hold commitment hearing set under AS 47.30.715 upon receipt of proper petition for 30-day commitment).

interaction [led] to . . . tangential and disordered thoughts." When asked whether he thought Aiden's irritability was "specific to being at API," the nurse practitioner responded that although "being at API exacerbates his irritability" he also "engage[s] in aggressive and assaultive behavior" while in the community.

The nurse practitioner also testified about Aiden's aggression toward staff members, including both physical violence and verbal threats. He recounted Aiden's attempt to flee on admission, his subsequent restraint and combativeness, and his later attempt to hit an API staff member. According to the nurse practitioner, Aiden "had daily events involving brief manual restraints and emergency gurneys," but had not been violent toward any staff since the first instance. The nurse practitioner also testified about verbal threats Aiden made on the date of his admission, including that he was going to attack staff and that he would "[hurt] anyone who gets in his way or interrupts his spiritual journey." The nurse practitioner was not aware of any direct threats since that day.

The nurse practitioner explained that there had been some improvement in Aiden's condition while at API. He testified that he had "noticed an improvement in [Aiden's food] intake" since Aiden's arrival at API, and that Aiden had not defecated or urinated on the floor as he had while in jail. The nurse practitioner also said that Aiden had been able to shower and change himself after being prompted. The nurse practitioner attributed this improvement to "emergency crisis medications" that Aiden had received since admission.

The nurse practitioner expressed concern about Aiden's ability to care for himself outside of API. He testified that he did not "believe [Aiden] would be able to access consistent food sources," that Aiden was not demonstrating good judgment, and that Aiden was "unable to provide a reasonable discharge plan" or arrange for his own housing. Aiden had stated he would stay at an expensive hotel despite there being no indication he had money or the ability to make such arrangements. The nurse practitioner characterized Aiden's discharge plans as "not . . . rooted in reality." The

nurse practitioner further did not think Aiden would take medication if he left API, and expected that Aiden's condition would deteriorate without medication. He described Aiden's treatment needs as "consistent nutritional support, a safe living environment, and medications to remit psychosis and irritability." He did not anticipate Aiden being able to meet those needs through outpatient services because he did not believe Aiden could or would comply with medication schedules or cooperate with outpatient appointments.

Aiden testified on his own behalf regarding a possible discharge plan. He testified that he had previously arranged to stay at various hotels, that he had "a place in a mobile trailer park on the south side of Anchorage to stay," and that if he acquired a car he would stay in the car. He expressed familiarity with shelters in Anchorage but did not think he would need to go to one. He was unconcerned with his ability to find food on discharge, but testified that it would be an option for him to eat at a local soup kitchen. He stated that his "intentions aren't to hurt anybody" if released. Aiden also expressed frustration with what he perceived as his illegal detention and hospitalization.

Following Aiden's testimony the master made findings on the record. The master found by clear and convincing evidence that Aiden had a mental illness. She further noted that Aiden was symptomatic in that he was irritable, experiencing delusions, and physically aggressive. The master thus found that Aiden needed to be hospitalized because of the concern that he would cause harm to others. The master also found that the State had proved Aiden was gravely disabled, but that this was "a closer question." In finding Aiden gravely disabled, the master recognized Aiden's improvement at API but ultimately found that the evidence demonstrated he "would not be able to tend to his needs for food, shelter, clothing, housing, and so on if he was discharged." The master also made written recommendations memorializing the on-record findings, and the superior court approved those recommendations and findings.

Aiden now appeals and argues three points: first, that his 12-day pre-evaluation detention violated his due process rights and applicable statutes; second, that

the superior court erred by failing to order, without being asked, a review hearing after various updates concerning Aiden's continued detention; and third, that the court erred by failing to consider how Aiden's 12-day detention may have impacted the evidence related to its 30-day commitment order. At no point did Aiden make any of these objections before the superior court. All points are raised for the first time on appeal.

## III. STANDARD OF REVIEW

We review issues raised for the first time on appeal for plain error.[12] Plain error requires an "obvious mistake" that is "obviously prejudicial."[13] We apply our independent judgment when interpreting the Alaska Constitution and the mental health commitment statutes.[14] An error can be plain even if there was near-uniform precedent supporting the action or decision at the time it was made, but the relevant precedent was later overturned.[15]

## IV. DISCUSSION

Two of our recent decisions, *In re Hospitalization of Vern H.*[16] and *In re Hospitalization of Mabel B.*,[17] and another prior decision, *In re Hospitalization of Gabriel C.*,[18] address pre-evaluation detention and due process. The recent cases had

---

[12] *In re Hospitalization of Connor J.*, 440 P.3d 159, 163 (Alaska 2019).

[13] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[14] *Id*. at 837.

[15] *Johnson v. State*, 328 P.3d 77, 83 n.27 (Alaska 2014). While *Johnson v. State* is a criminal appeal discussing plain error review of various criminal rules, we apply the general principles of plain error review to civil cases. *See, e.g.*, *In re Gabriel C.*, 324 P.3d at 838 (defining plain error by quoting criminal case *Adams v. State*, 261 P.3d 758, 773 (Alaska 2011)).

[16] 486 P.3d 1123 (Alaska 2021).

[17] 485 P.3d 1018 (Alaska 2021).

[18] 324 P.3d 835 (Alaska 2014).

not been decided at the time of Aiden's 30-day commitment hearing. They nevertheless inform our plain error analysis in this matter.

In *In re Gabriel C.* we recognized that the mental commitment statutes evince a legislative intent for immediate transport to an evaluation facility once an emergency mental health evaluation is ordered.[19] We further held in *In re Mabel B.* that a pre-evaluation detention of 15 days at a hospital due to "lack of capacity" at the evaluation facility was a substantive due process violation.[20] This is because prolonged detention due to lack of space at an evaluation facility is not reasonably related to the purpose of "immediate delivery" to the evaluation facility.[21] And in *In re Vern H.* we held that an individual may be held in jail while awaiting transport to an evaluation facility only if the State shows by clear and convincing evidence that jail is the least restrictive available alternative.[22] We also determined that the 4-day pre-evaluation detention in that matter did not violate substantive due process.[23] Together these three decisions make clear that extended pre-evaluation detentions in the mental health commitment context are disfavored and cannot be justified by predictable matters within the State's control, such as chronic lack of facility capacity.[24]

---

[19] *Id.* at 838.

[20] *In re Mabel B.*, 485 P.3d at 1025-26.

[21] *Id.*

[22] *In re Vern H.*, 486 P.3d 1123, 1131 (Alaska 2021).

[23] *Id.* at 1132.

[24] *See In re Mabel B.*, 485 P.3d at 1025-26 (agreeing with Ninth Circuit Court of Appeals that "[l]ack of funds, staff, or facilities" cannot justify a failure to provide committed persons the treatment necessary for rehabilitation (citing *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003))).

## A. Aiden's Procedural Due Process Rights

To analyze whether state action has violated an individual's procedural due process rights, we weigh three factors: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used; and (3) the State's interest, including the fiscal and administrative burdens of additional procedural requirements."[25]

Aiden argues that the superior court made an obvious mistake when it did not, on its own, find a procedural due process violation during his period of pre-evaluation detention, when it considered DOC's extension request, or during the 30-day commitment hearing. Aiden further proposes that our decision in *In re Vern H.* requires courts, under any circumstance, to hold review hearings whenever there is any delay in transportation for evaluation.

As an initial matter, we disagree with this understanding of our precedent. In *In re Vern H.* we addressed a procedural due process claim related to an individual's detention in jail while awaiting transport for an emergency mental health evaluation.[26] We recognized that while important liberty interests were at stake, the State also had "a clear interest in protecting the welfare and safety of its citizens."[27] To balance the interests at stake we required the State to show at a review hearing that jail was the least restrictive alternative available.[28] We did not, however, hold that courts are *required*

---

[25] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[26] *In re Vern H.*, 486 P.3d at 1129-32.

[27] *Id.* at 1129-30.

[28] *Id.* at 1131. If a person is taken into custody pursuant to AS 47.30.705, as Vern H. was, that person cannot be detained in jail "except for protective custody purposes and only while awaiting transportation." AS 47.40.705(a).

sua sponte to hold a review hearing anytime an individual is detained in jail awaiting transport for a mental health evaluation.[29]

Moreover, we see no obvious mistake here. Under the facts of this case it is not obvious that the court should have acted on its own initiative. There is no question that Aiden's liberty is an important interest that must be protected against the risk of an erroneous deprivation.[30] Procedural protections currently in place that guard against erroneous deprivations include strict statutory timelines,[31] automatic appointment of an attorney,[32] the right to request a review hearing,[33] and our direction to courts to "expedite an evaluation if the respondent cannot be transported . . . without delay."[34] The superior court in this case also required daily status reports until Aiden was transported for evaluation. The last four status reports, provided during the latter half of Aiden's detention, explained that continued detention was necessary due to Aiden's possible exposure to COVID-19 and his related refusal to be screened. When Aiden made no objection to continued detention and made no request for a review hearing, it is not obvious that the court should have rejected the State's justifications and called its own review hearing. Nor is it obvious that the court's procedures risked an erroneous deprivation of Aiden's liberty.

---

[29]     *See In re Vern H.*, 486 P.3d at 1131.

[30]     *Id*. at 1129; *In re Gabriel C.*, 324 P.3d at 839 (recognizing that involuntary commitment is a "massive curtailment of liberty").

[31]     *See* AS 47.30.700-.755 (detailing various statutory timelines).

[32]     AS 47.30.700(a).

[33]     *See, e.g.*, *In re Vern H*, 486 P.3d at 1130; *In re Hospitalization of Mabel B.*, 485 P.3d 1018, 1021-22 (Alaska 2021).

[34]     *In re Gabriel C.*, 324 P.3d at 838.

Aiden did not object to his detention, making his case very different from the pre-evaluation detentions we considered in *In re Gabriel C.*, *In re Mabel B.*, and *In re Vern H.*  In each of those matters, the detained person objected to further detention, alerted the superior court to possible due process violations, or requested a review hearing.[35]  Here Aiden's attorney was receiving regular updates on the status of transportation and took no action.  Nor did Aiden object to the requested detention extension.  It is not clear whether Aiden's lack of response was purposeful, strategic, or oversight.[36]  It is also not obvious that Aiden's refusal to comply with COVID-19 protocols should have been addressed differently by the court, particularly in the absence of any objection or request by Aiden.

Additionally, it is not obvious that Aiden was prejudiced by the lack of a sua sponte review hearing.  It is true that, at a review hearing, the State would have had to prove that jail was the least restrictive available alternative.[37]  But during this time period Aiden was "refusing COVID-19 screening" following a COVID-19 exposure at the height of the pandemic and before vaccinations were available.  The court had twice recently determined that probable cause existed to believe Aiden was gravely disabled and a danger to others.  Previous information before the court indicated that Aiden was refusing meals and medication, defecating on the floor, and behaving explosively toward those around him.  Given these facts it is not obvious that another less restrictive

---

[35]     *See In re Vern H.*, 486 P.3d at 1126; *In re Mabel B.*, 485 P.3d at 1021-22; *In re Gabriel C.*, 324 P.3d at 836.

[36]     In some cases, not requesting a review hearing may be an intentional decision.  This type of strategic decision-making is one reason attorneys are appointed automatically as a procedural protection for respondents.  An individual's attorney, not the court, is better positioned to ascertain a client's wishes and to request a review hearing if necessary.

[37]     *In re Vern H.*, 486 P.3d at 1131.

facility would have accepted him. Indeed, it is not obvious that *any* facility would have accepted him given his refusal to be screened for COVID-19.

We also disagree with Aiden's argument that a 12-day pre-evaluation transportation delay is necessarily a structural defect requiring automatic reversal.[38] We note that Aiden first substantively raised a "structural error" argument in his reply brief, and this argument is therefore waived.[39] Even were it not waived, there are reasons an individual's transport might be delayed, particularly in Alaska and particularly during a pandemic. The determination of a procedural due process violation will turn upon an individualized examination of the relevant factors. This includes the private interest at stake, the risk of erroneous deprivation of that interest given the procedures used, and the State's interests, including any burden associated with additional procedural requirements.[40] Given that there exist legitimate reasons for delays in transportation, we cannot hold that every 12-day delay amounts to structural error.

Here, given the information before the superior court, and the available procedural protections safeguarding Aiden's rights, including appointment of counsel, the requirement of periodic reporting pending transportation, and the right to request a review hearing, we cannot conclude that Aiden's procedural due process rights were violated. Similarly, although we encourage courts to closely monitor cases involving delay in transportation for evaluation and to convene hearings and require information

---

[38] *See, e.g.*, *Alvarez-Perdomo v. State*, 454 P.3d 998, 1008 (Alaska 2019) (discussing structural error and why it can result in automatic reversal); *Jordan v. State*, 420 P.3d 1143, 1148 (Alaska 2018) (discussing structural due process error and why it evades normal harmless error review).

[39] Arguments first raised in a reply brief are considered waived. *Danco Expl., Inc. v. State, Dep't of Nat. Res.*, 924 P.2d 432, 434 n.1 (Alaska 1996).

[40] *In re Gabriel C.*, 324 P.3d at 838.

where concerns arise, we do not impose an automatic hearing requirement every time transportation for evaluation is delayed.

**B.    Aiden's Substantive Due Process Rights**

When examining whether a state action violated an individual's substantive due process rights, we are concerned with laws that exceed the limits of state authority or that are "unfair, irrational . . . arbitrary . . . [or] shock[] the universal sense of justice."[41]  This analysis is different from a procedural due process analysis, which is largely concerned with the procedures used prior to depriving a person of life, liberty, or property.[42]

The question whether Aiden's pre-evaluation detention violated his substantive due process rights requires us to examine whether the nature and duration of the detention bears any reasonable relation to the purposes for which Aiden was ordered hospitalized.[43]  "Lack of funds, staff, or facilities cannot justify the State's failure to provide [detained incapacitated persons] with [the] treatment necessary for rehabilitation."[44]  Similarly, lack of capacity at an evaluation facility is not an acceptable justification for an extended detention because lack of capacity bears no

---

[41]    *Burke v. Criterion Gen., Inc.*, 499 P.3d 319, 326 (Alaska 2021) (identifying goal of substantive due process analysis to guard against "unfair, irrational, or arbitrary state conduct that shock[s] the universal sense of justice").

[42]    *See, e.g.*, *Burns v. Burns*, 466 P.3d 352, 360 (Alaska 2020); *In re Gabriel C.*, 324 P.3d at 838-39; *Copeland v. Ballard*, 210 P.3d 1197, 1201 (Alaska 2009).

[43]    *In re Hospitalization of Mabel B.*, 485 P.3d 1018, 1025 (Alaska 2021) (applying the "reasonable relation" standard explained by the Ninth Circuit in *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003)).  The Ninth Circuit in *Mink* relied on the U.S. Supreme Court's decision in *Jackson v. Indiana*, 406 U.S. 715 (1972), to develop its reasonable relation standard.  *See Mink*, 322 F.3d at 1122.

[44]    *Mink*, 322 F.3d at 1121 (second alteration in original); *In re Mabel B.*, 485 P.3d at 1026.

reasonable relation to the purpose of the detention and therefore makes the detention arbitrary.[45]

Using this framework we concluded in *In re Mabel B.* that a 15-day delay due to lack of capacity violated substantive due process.[46] We declined, however, to provide an exact duration at which a pre-evaluation detention becomes a due process violation.[47] The determination that the State exceeded its authority, or acted in an arbitrary or unfair manner, requires an appraisal of the totality of the facts in any given case.[48] The State's justification for delay is but one factor.[49] In contrast with *In re Mabel B.*, we concluded that the 4-day pre-evaluation delay in *In re Vern H.* was not unreasonable and did not violate substantive due process, given the specific facts of that case.[50] Aiden's case demonstrates why a fixed number of days is not the standard for determining when a pre-evaluation detention amounts to a substantive due process violation.

Our fact-intensive analysis of substantive due process in the mental health commitment context suggests that there are some circumstances in which delaying transport of detained persons may be appropriate. For instance, delay in transport may be appropriate or even necessary to protect the safety of the detained person or others. Implicit in the requirement that the State transport individuals immediately for evaluation is the State's responsibility to transport people *safely*. Weather delays, dangerous travel conditions, and other justifications outside the State's control present appropriate reasons for limited transport delays to ensure the safe transport of the person

---

[45]  *In re Mabel B., 485 P.3d at 1026.*

[46]  *Id.*

[47]  *Id.*

[48]  *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)).

[49]  *Id.*

[50]  *In re Hospitalization of Vern H.*, 486 P.3d 1123, 1132 (Alaska 2021).

and staff conducting the transport. These sorts of delays are reasonably related to the purpose of immediate delivery to an evaluation facility, namely getting that person to the evaluation facility safely so that the person can be meaningfully evaluated. Another appropriate consideration for delaying transport may be to prevent the transmission of a deadly disease to vulnerable people within the receiving institution.

Aiden argues that the court erred by not recognizing a substantive due process violation during his detention. We again see no *plain* error. Given the facts of this case, it is not obvious that the court made a mistake. Aiden's initial detention lasted for seven days, and on the seventh day the State asked for an extension of the evaluation order. Seven days is only three days longer than the four-day detention at issue in *In re Vern H.* and does not approach the 15-day detention in *In re Mabel B.*[51] Of the seven days Aiden was initially detained, only five were justified by a lack of capacity. The State justified the remaining two days with public health concerns due to the pandemic. At that point Aiden's substantive due process rights had not been obviously violated.

Similarly, there was no obvious due process violation following the court's extension of the order for transport and evaluation. The court approved the extension on October 1 after receiving two status reports with arguably appropriate justifications for a delay in transport.[52] The court then received two additional status reports before Aiden was transported. Both pointed to Aiden's exposure to COVID-19 and his continued refusal of COVID-19 screening as justification for delay. In total, only five days of the 12-day delay were due to the impermissible justification of lack

---

[51]     *Id.*; *In re Mabel B.*, 485 P.3d at 1026.

[52]     We do not hold that a transportation delay due to COVID-19 concerns is *always* an appropriate justification. We only point out that under the specific facts of this case, it was not an *obvious error* for the court to consider it so.

of capacity. The remaining seven days were, at a minimum, arguably reasonably related to the purpose of immediate delivery. Given these facts we cannot say that there was an obvious violation of Aiden's substantive due process rights.

### C. Aiden's Civil Commitment And Quarantine Statutory Rights

Alaska's mental health commitment statutes and quarantine statutes include specific timelines and requirements that state agencies and courts must follow.[53] The commitment statutes include an initial probable cause standard prior to ordering an involuntary emergency examination,[54] a 24-hour evaluation time limit once an individual arrives at a facility on an emergency basis,[55] and a 72-hour time limit for a facility to conduct a full evaluation and either release the person or file a petition for a 30-day commitment for treatment.[56] There is no express deadline for transportation to an evaluation facility once ordered, but we have held that the legislature intended delivery to be immediate.[57]

The public health isolation and quarantine statutes allow the State to isolate or quarantine individuals to prevent the spread of contagious diseases.[58] Any action taken under the quarantine statutes requires the State to petition for a court order allowing the quarantine, necessitates regular monitoring of the quarantined individual, and must be the least restrictive means necessary to prevent the spread of the disease.[59] The statute also contains procedures for short-term emergency quarantines without

---

[53] *See* AS 47.30.700-.815; AS 18.15.355-.395.

[54] AS 47.30.700, .705.

[55] AS 47.30.710(a).

[56] AS 47.30.715.

[57] *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014).

[58] AS 18.15.385(a).

[59] AS 18.15.385(b), (d).

prior court approval.[60]  A quarantined individual has the right to a court hearing to review the quarantine within 48 hours of a petition.[61]

Aiden argues that given the State's concern about his COVID-19 exposure in the midst of his commitment proceedings, the public health statutes apply and the State was therefore required to seek a quarantine order.  He contends that as soon as the State used COVID-19 to justify its delay in transporting him the State was also required to petition the court for an additional order allowing him to be quarantined.  The crux of this argument is that the court should have, on its own, required the State to make additional applications.  In this case, however, it is not obvious that the quarantine statutes were implicated.

The superior court had determined there was probable cause that Aiden was mentally ill and that his illness caused him to be gravely disabled and a danger to others.  His subsequent detention was based on the court's mental health evaluation order.  The purpose of the order was to detain Aiden so that he could be transported for an evaluation.  Aiden was not being detained in jail solely for quarantine.  Aiden's quarantine was secondary to his being held for a mental health evaluation, though it did provide a justification for a delay in his transportation for evaluation.  It is not obvious to us that the court must have applied the quarantine statutes under these circumstances.

This is not to say that the need to quarantine an individual can justify unlimited delays in transportation for a mental health evaluation.  To the contrary, the State can detain or quarantine a person in a mental health context only if the detention is reasonably related to the purpose of immediate delivery to an evaluation facility.  In Aiden's case, had there been an available option to safely transport Aiden instead of holding him in quarantine, the State would have been required to take it.  On the record

---

[60]     AS 18.15.385(e).

[61]     AS 18.15.385(f).

before us, though, it is not obvious that there was another option or that application of quarantine law would have resulted in any change in Aiden's situation.

Given the absence of any explicit statutory mandate to apply the quarantine statutes, and given that it is not clear that the application of the quarantine statutes would have led to a different result in this case, we see no plain error in the court's application of only the mental health commitment statutes.

## D. The Effects Of Aiden's Detention On Aiden's Mental Illness

Aiden argues that the superior court erred by not considering the effect that his pre-evaluation detention had on his mental illness and behavior. He asserts that being in jail for 12 days caused him to decompensate and caused the problematic behavior that led the court, at the 30-day commitment hearing, to find him gravely disabled and a danger to others. In other words Aiden argues that the detention itself, not his mental illness, caused him to be gravely disabled and a danger to others thereby invalidating the court's conclusions.[62]

The record does not support this assertion. In the initial evaluation order, issued only two days after Aiden's arrest and detention, the court determined there was probable cause to believe that Aiden was likely to cause harm to others and was gravely disabled. The court noted that Aiden had been arrested and detained for assault and had been diagnosed with and was suffering from schizoaffective disorder, antisocial personality disorder, and polysubstance use disorder. This, according to the court, included "persecutory and grandiose delusions," refusing meals, disorientation, and poor judgment. These symptoms, some aggressive and some not, were present after only two days in detention.

---

[62] AS 47.30.730 (requiring likelihood to cause harm to others be "result" of mental illness); AS 47.30.915(11) (defining "gravely disabled" as being "result of mental illness").

Both the court's extension order and its 30-day commitment findings describe similar symptoms. Testimony at the commitment hearing also pointed to the fact that despite improvements, Aiden was still suffering from symptoms of a mental illness that made him a danger to himself and others. The nurse practitioner testified that Aiden was still experiencing delusions, had no plan to access consistent food, would not take his medication on his own, could not be managed in an outpatient setting, and that his condition would deteriorate without inpatient support. The court recognized that Aiden's condition improved once he arrived at API, but also expressed concern that the improvement was due to crisis medications and that he would become aggressive again if he left API. Reviewing for plain error, it is far from obvious that Aiden's symptoms and behaviors resulted wholly or largely from his detention in jail as opposed to his mental illness. To the contrary, the court's findings throughout and following his pre-evaluation detention support its conclusion that Aiden's symptoms were a result of his mental illness and caused him to be gravely disabled and a danger to others.

The court's failure to consider the impact of Aiden's pre-evaluation detention when it ordered a 30-day commitment was neither obviously mistaken nor obviously prejudicial. The court therefore did not plainly err in ordering the 30-day commitment.

## V. CONCLUSION

We AFFIRM the superior court's orders in this case.